# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

**OCT 0 5 2000**

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| MARIA McKENZIE, on behalf of herself and all others similarly situated, | § § § | CIVIL ACTION NO. B-00-148 JURY |
| Plaintiffs, | § § | |
| v. | § § | |
| WORLDCOM, INC. a/k/a MCI WORLDCOM, INC. a/k/a MCI WORLDCOM COMMUNICATIONS, INC., | § § § § | |
| Defendant. | § § | |

---

## MEMORANDUM IN SUPPORT OF MCI WORLDCOM COMMUNICATIONS, INC.'S MOTION TO DISMISS PLAINTIFF'S PETITION

---

John C. Eichman
State Bar No. 06494800
Kerry C. Ahern
State Bar No. 24012195
**JENKENS & GILCHRIST**
*A Professional Corporation*
1445 Ross Ave., Suite 3200
Dallas, Texas 75202

John Alex Huddleston
State Bar No. 10148400
**JENKENS & GILCHRIST**
*A Professional Corporation*
1800 Frost Bank Tower
100 West Houston Street
San Antonio, Texas 78205

**OF COUNSEL:**
Thomas F. O'Neil
William E. Smith
WORLDCOM, INC.
Law and Public Policy
1133 19th Street, N.W.
Washington, D.C. 20036

**ATTORNEYS FOR DEFENDANT MCI WORLDCOM COMMUNICATIONS, INC.**

Dallas3 624531 v 3, 46943.00103

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PLAINTIFF'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     THE FILED TARIFF DOCTRINE REQUIRES CUSTOMERS TO PAY
THE TARIFFED RATE AND PRECLUDES COURTS FROM JUDGING
THE LAWFULNESS OF A TARIFFED RATE. . . . . . . . . . . . . . . . . . . . . . . 3

      A.    Only the FCC has the power to alter the terms of the tariff. . . . . . . . . . . 4

      B.    Judicial alteration of the tariff offends the regulatory mandate of
uniformity in rates charged by common carriers. . . . . . . . . . . . . . . . . . 6

II.     THE FILED TARIFF DOCTRINE BARS PLAINTIFF'S CLAIMS. . . . . . . . . 7

III.    PLAINTIFF'S CLAIMS ARE PREEMPTED BY THE COMMUNICATIONS
ACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.    PLAINTIFF FAILS TO STATE A CLAIM FOR NEGLIGENT
MISREPRESENTATION OR VIOLATION OF THE DTPA. . . . . . . . . . . . . 14

      A.    A person is conclusively presumed to know the contents of the tariff,
and cannot show reliance on any misrepresentations to the contrary. . . . 15

      B.    Because the filed rate is the only lawful rate, Plaintiff suffered no
cognizable injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

## FEDERAL CASES

*AT&T v. Central Office Telephone, Inc.*, 118 S. Ct. 1956 (1998) .. 4, 5, 7, 8, 12

*Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981) ........................ 4, 7

*Armour Packing Co. v. United States*, 209 U.S. 56 (1908) ........................ 4, 7

*Cahnmann v. Sprint Corp.*, 133 F.3d 484 .................................. 10, 11, 12, 14

*Carter v. AT&T Co.*, 365 F.2d 486 (5th Cir. 1966) .................................. 3, 12

*Fax Telecommunicaciones Inc. v. AT&T*, 138 F.3d 479 (2d Cir. 1998) ......... 4

*Kansas City S. R.R. v. Carl*, 227 U.S. 639 (1913) .................................. 12, 14

*Keogh v. Chicago & N.W. Railway Co.*, 260 U.S. 156 (1922) ................. 4, 12

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991) ........................... 3

*Kutner v. Sprint Communications Co.*, 971 F. Supp. 302 (W.D. Tenn. 1997)  7

*Louisville & N. R. Co. v. Maxwell*, 237 U.S. 94 (1915) ............................. 7, 8

*Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516 (1939) ... 4, 12

*MCI Telecommunications Corp. v. AT&T Co.*, 512 U.S. 218 (1994) ..... 4, 5, 7

*MCI Telecommunications Corp. v. Garden State Investment Corp.*, 981 F.2d 385 (8th Cir. 1992) .................................................................................. 5

*MCI Telecommunications Corp. v. Graham*, 7 F.3d 477 (6th Cir. 1993) ....... 5

*Mack v. South Bay Beer Distributing Inc.*, 798 F.2d 1279 (9th Cir. 1986) .... 3

*Maislin Industrial U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116 (1990) ...............................................................    4, 7, 8, 12, 14

*Marco Supply Co. v. AT&T*, 875 F.2d 434 (4th Cir. 1989) ............................. 5

*Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir. 1998) .................. 6, 7, 8, 9, 10, 12, 14, 15

*Marcus v. AT&T Corp.*, 938 F. Supp. 1158 (S.D.N.Y. 1996), aff'd, 138 F.3d 46 ..................................................................................... 3

*Montana-Dakota Utilities Co. v. Northwestern Public Service Co.,*
341 U.S. 246 (1951) ............................................................... 6, 7

*Morales v. Attorneys' Title Insurance Fund, Inc.,* 983 F. Supp. 1418
(S.D.Fla. 1997) ........................................................... 15, 16, 17

*Security Services, Inc. v. Kmart Corp.,* 511 U.S. 431 (1994) ................. 12, 14

*Sierra Club v. Morton,* 405 U.S. 727 (1972) .................................... 17

*Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409 (1986) ........ 7

*Stein v. Spring Corp.,* 22 F. Supp. 2d 1210 (D. Kansas 1998) ............... 16, 17

*Sun City Taxpayers' Association v. Citizens Utilities Co.,* 45 F.3d 58
(2d Cir.), cert. denied, 514 U.S. 1064 (1995) ........................... 7

*Sun City Taxpayers' Association v. Citizens Utilities Company,* 847 F. Supp.
281 (D. Connecticut 1994) ...................................... 17

*Taffet v. Southern Co.,* 967 F.2d 1483 (11th Cir. 1992) ................................. 17

*Texas & P. Railway Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426 (1907) ..... 6

*Texas & P. Railway Co. v. Mugg & Dryden,* 202 U.S. 242 (1906) ................ 5

*Wagner & Brown v. ANR Pipeline Co.,* 837 F.2d 199 (5th Cir. 1988) ........... 6

*Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17 (2d Cir. 1994) .................... 7, 11

## STATE CASES

*Celtic Life Insurance Co. v. Coats,* 885 S.W.2d 96 (Tex.1994) .................... 16

*Century 21 Real Estate Corp. v. Hometown Real Estate Co.,* 890 S.W.2d 118
(Tex.Civ.App.-Texarkana 1994, writ denied) ......................... 15

*Doe v. Boys Club of Greater Dallas, Inc.,* 907 S.W.2d 472 (Tex. 1995) ..... 15

*First Interstate Bank of Tex., N.A. v. S.B.F.I., Inc.,* 830 S.W.2d 239
(Tex. App.-Dallas 1992, no writ) ....................................... 15, 16

*Kanuco Technology Corp. v. Worldcom Network Services, Inc.,* 979 S.W.2d
368 (Tex. App. - Houston [14th Dist.] 1998, no pet.) ................ 8

*Porr v. NYNEX Corp.,* 660 N.Y.S.2d 440 (1997) ........................... 9

# FEDERAL STATUTES

47 U.S.C. §§ 151 et seq ........................................................................ 3, 8

47 U.S.C. § 201 ................................................................................ 13

47 U.S.C. § 203 ........................................................................... 3, 4, 13

47 U.S.C. § 204 ................................................................................ 5

47 U.S.C. § 205 ................................................................................ 5

47 U.S.C. § 206 ................................................................................ 13

47 U.S.C. § 207 ................................................................................ 13

47 U.S.C. § 208 ................................................................................ 5

47 U.S.C. § 414 ................................................................................ 8

Pursuant to Federal Rules of Civil Procedure 12(b)(6), Defendant MCI WORLDCOM Communications, Inc. ("WorldCom") respectfully moves this Court to dismiss the First Amended Petition ("Petition") filed against WorldCom by Plaintiff Maria McKenzie ("Plaintiff"), on behalf of herself and all others similarly situated.

## INTRODUCTION

Plaintiff challenges certain fees, rates, charges and restrictions applicable to long-distance telecommunications services provided by WorldCom. She asserts state law claims for violation of the Texas Deceptive Trade Practices Act ("DTPA") and for negligent misrepresentation. Under the familiar standards applicable to a Rule 12(b)(6) motion, Plaintiff's petition should be dismissed because the Petition does not state a legally cognizable claim. Even if all the allegations in Plaintiff's petition are taken as true (and they are not), the claims should be dismissed as a matter of law because they are foreclosed by the filed tariff doctrine.

The fees, rates, charges and restrictions applicable to WorldCom's long-distance service are set forth in tariffs (the "Tariffs") filed with the Federal Communications Commission (the "FCC"). A duly filed tariff has the force and effect of law and all are deemed to have knowledge of its contents. To prevent rate discrimination, the filed tariff doctrine operates as a conclusive bar to any claim that challenges the validity of duly filed rates or that would result in a customer paying less than the tariffed rate. Because Plaintiff claims she should have been charged a rate lower than the rate set forth in WorldCom's Tariff, she is claiming a right to a discriminatory non-tariffed rate. Plaintiff's Petition must be dismissed because such discriminatory practices are barred by the filed tariff doctrine.

Plaintiff's Petition fails for other reasons as well. First, Plaintiff's claims, which are all based on state law, are preempted by federal law pursuant to the Communications Act of 1934. Second, because the Plaintiff is conclusively presumed to have knowledge of WorldCom's Tariff, she cannot

1

show reasonable reliance on any representation that conflicts with the Tariff. Finally, because the tariffed rate is the only legal rate, Plaintiff has suffered no cognizable injury and therefore has no standing to assert her state law claims.

### PLAINTIFF'S CLAIMS

Plaintiff alleges causes of action for negligent misrepresentation and violation of the DTPA, claiming that WorldCom made certain misrepresentations and failed to disclose certain rates, fees, charges or restrictions in advertisements and solicitations. Petition, ¶ 10-12. Plaintiff alleges, among other things, that WorldCom:

- Failed clearly and conspicuously to disclose in its advertisements and solicitations the "Carrier Access Charge"(Petition, ¶ 37.a); the "Federal Universal Service Fee"(Petition, ¶ 37.b); other monthly fees (Petition, ¶ 37.c); the monthly minimum charge (Petition, ¶ 37.d); and location and time of day restrictions (Petition, ¶ 37.e-f).

- Misrepresented, directly or impliedly, that billing for its long distance services would be included with the consumer's local telephone bill when in fact consumers received two bills (Petition, ¶ 37.j).

- Engaged in deceptive advertising and solicitation practices by cramming unwanted enhanced services onto consumers' phone bills (Petition, ¶ 37.m).

- Concealed, suppressed and/or omitted by failing to clearly and conspicuously disclose the fact that there is a surcharge on all calling card calls (Petition, ¶ 37.t).

Plaintiff seeks damages from and an injunction against WorldCom because she and other Texas consumers allegedly paid more than the advertised rate for telecommunications services. Petition, ¶ 14.

# ARGUMENT

## I. THE FILED TARIFF DOCTRINE REQUIRES CUSTOMERS TO PAY THE TARIFFED RATE AND PRECLUDES COURTS FROM JUDGING THE LAWFULNESS OF A TARIFFED RATE.

The relationship between interstate long distance phone companies and their customers is not governed by principles of private contract law -- state or federal. Rather, to protect consumers, Congress has established a comprehensive federal regulatory scheme to set reasonable rates and prevent discrimination among ratepayers. This scheme is set forth in the Communications Act of 1934, 47 U.S.C. §§ 151 et seq. (the "Communications Act"). Under the Communications Act, common carriers such as WorldCom must "file with the [FCC] . . . schedules showing all charges . . . and showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a). The schedules filed under the Communications Act are known as "tariffs." The tariff scheme thus creates a forum in the FCC for the establishment of reasonable, uniform rates for regulated telecommunications services. This forum is exclusive, for any intrusion into the regulatory system disrupts its key purpose: to prevent discrimination in rates paid by consumers.

Pursuant to these statutory and regulatory requirements, WorldCom has filed with the FCC its Tariffs, which contain the schedules listing rates charged for WorldCom's interstate and international customers. The pertinent provisions of WorldCom's Tariff F.C.C. No. 1 are attached hereto as Exhibit A.[1] The rates, fees, charges and restrictions Plaintiff attacks in her Petition are set forth in the Tariff. Plaintiff's claims are nothing more than a thinly disguised attempt to set aside the terms of WorldCom's tariff.

---

[1]   The relevant pages of WorldCom's applicable tariffs are attached to this brief as Exhibit A. These tariffs are public documents. It is well established that a Court may take judicial notice of tariffs to resolve a motion to dismiss. See, e.g., Carter v. AT&T Co., 365 F.2d 486, 491-91 & n.7 (5th Cir. 1966) (district court authorized to take judicial notice of tariff filings); Marcus v. AT&T Corp., 938 F. Supp. 1158, 1164-65 (S.D.N.Y. 1996), aff'd, 138 F.3d 46 (2d Cir. 1998) (taking judicial notice of tariffs filed with the FCC for purposes of a motion to dismiss); see also Mack v. South Bay Beer Distrib. Inc., 798 F.2d 1279, 1282 (9th Cir. 1986); Kramer v. Time Warner, Inc., 937 F.2d 767, 774 (2d Cir. 1991).

### A.    Only the FCC has the power to alter the terms of the tariff.

A carrier cannot "charge, demand, collect or receive a greater or less or different compensation for . . . communication, or for any service in connection therewith . . . than the charges specified in the [tariff] then in effect." 47 U.S.C. § 203(c). See AT&T v. Central Office Telephone, Inc., 118 S. Ct. 1956, 1962 (1998); MCI Telecommunications Corp. v. American Tel. & Tel. Co, 512 U.S. 218, 230 (1994). Once a tariff is filed with the FCC, it attains the status of binding federal law. See, e.g., Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520 (1939) ("Until changed, tariffs bind both carriers and [customers] with the force of law."); Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 163 (1922) ("Unless and until suspended or set aside, [the tariff] rate is made, for all purposes, the legal rate . . . ."). Making the tariff federal law has the effect of binding common carriers to a national set of rates and services so that consumers are protected from discrimination and the  FCC is provided with a mechanism to ensure that the rates charged by common carriers are reasonable. Because any deviation from the filed rate dilutes the effectiveness of the doctrine and destroys the purpose of the regulatory system, such deviation is forbidden.

The filed tariff doctrine "is the central principle of the regulatory scheme for interstate telecommunications carriers." Fax Telecommunicaciones Inc. v. AT&T, 138 F.3d 479, 488 (2d Cir. 1998). In its recent decision in Central Office Telephone, the Supreme Court emphatically reaffirmed the "century old" filed tariff doctrine, which protects the FCC's exclusive authority to regulate interstate and international rates. 118 S. Ct. at 1962. See also Maislin Indus. U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 126 (1990); Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 582 (1981) ("Arkla"); Keogh, 260 U.S. at 163; Armour Packing Co. v. United States, 209 U.S. 56, 80-81 (1908);

Texas & P. Ry. Co. v. Mugg & Dryden, 202 U.S. 242, 245 (1906).[2] As the Court explained in Central Office Telephone, "the rate of the carrier duly filed [in a tariff] is the only lawful charge . . . . [T]he carrier must abide by it, unless it is found by the Commission to be unreasonable." 118 S. Ct. at 1962-63 (emphasis added) (quotation omitted). Indeed, as the Court made clear, "strict application [of the doctrine] is necessary" to protect the basic objectives of the Communications Act. Id. at 1963.

A carrier must charge the filed rate unless and until the FCC instructs it to do otherwise. As the Supreme Court recently held, "even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." Central Office Tel.,118 S. Ct. at 1963. Accord Marco Supply Co. v. AT&T, 875 F.2d 434, 435 (4th Cir. 1989).

The power to review and invalidate a filed tariff rests solely with the FCC, with judicial review in the United States Courts of Appeals. Only two means for challenging the lawfulness of filed tariffs exist. First, the FCC itself can initiate an action, upon complaint from a person such as Plaintiff or on its own initiative, to determine the lawfulness of any new or revised tariff. 47 U.S.C. § 204. Alternatively, Plaintiff could complain to the FCC about "anything done or omitted to be done by any common carrier subject to" the tariffing requirements of the Communications Act. 47 U.S.C. § 208(a). The FCC must then initiate an investigation into the lawfulness of the tariff. If the FCC finds the tariff unlawful "after full opportunity for hearing," it is authorized to reject the tariff and issue a cease and desist order. 47 U.S.C. § 205. Plaintiff should not be permitted to circumvent the avenues of relief provided by Congress by bringing this action.

---

[2]The filed rate doctrine was first established under the Interstate Commerce Act, and has been subsequently recognized under the Communications Act. Because of the similarities between the Communications Act and the Interstate Commerce Act, which served as its model, courts regularly look to case law interpreting the latter in cases involving the former. See MCI v. AT&T, 512 U.S. at 229-30; MCI Telecommunications Corp. v. Graham, 7 F.3d 477, 479-80 (6th Cir. 1993); MCI Telecommunications Corp. v. Garden State Inv. Corp., 981 F.2d 385, 387 (8th Cir. 1992).

**B.      Judicial alteration of the tariff offends the regulatory mandate of uniformity in rates charged by common carriers.**

"[The filed] tariff is by definition reasonable unless and until the FCC, as the legislatively appointed regulatory body with institutional competence, says otherwise." Marcus v. AT&T Corp., 138 F.3d 46, 61 (2d Cir. 1998) (internal quotation marks omitted). The principle that only the rate-setting agency may alter the filed rate is a cornerstone of the statutory scheme. See, e.g., Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 251-52 (1951) (holding that once a rate is filed with the appropriate agency, "except for review of the [agency's] orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one").

Because the WorldCom Tariffs govern the billing of WorldCom customers nationwide, only a determination by the FCC can achieve nationwide uniformity: the very purpose of the filed tariff doctrine. See, e.g., Texas & P. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 440-41 (1907); Wagner & Brown v. ANR Pipeline Co., 837 F.2d 199, 202 (5th Cir. 1988). Allowing individual courts to decide whether the Tariffs are illegal would achieve the exact opposite result -- "unless all courts reach an identical conclusion, a uniform standard of rates . . . would be impossible, as the standard would fluctuate and vary, depending upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject . . . ." Abilene Cotton Oil Co., 204 U.S. at 440. Therefore, adjudication of this issue by the Court would be "wholly inconsistent with the administrative power conferred upon the [FCC], and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed." Id. at 441.

Plaintiff claims she was injured by the difference between what she paid for telecommunications services, and what she believed WorldCom represented she would pay. Plaintiff

requests damages and an injunction as relief for her alleged injury. The filed tariff doctrine directly bars any award of damages that would result in customers effectively being charged a rate different from the one set forth in the tariff, and specifically precludes courts from awarding ratepayers relief that would change the filed rate. See, e.g., Montana-Dakota Utils. Co., 341 U.S. at 251-252; Arkla, 453 U.S. at 580-82. This preclusion of damages awards protects Congress' interest in preventing discrimination among ratepayers by ensuring that the Congressional scheme of uniform rate regulation is not disturbed. See, e.g., MCI v. AT&T, 512 U.S. at 230; Maislin Indus., 497 U.S. at 126.[3] The filed rate doctrine "precludes not only the award of remedies that actually change the filed rate, but also of remedies that would have that effect." Kutner v. Sprint Communications Co., 971 F. Supp. 302, 306 (W.D. Tenn. 1997).

Although the filed tariff doctrine is "undeniably strict, and . . . may work hardship in some cases," the Supreme Court has recognized that "it embodies the policy which has been adopted by Congress." Louisville & N. R. Co. v. Maxwell, 237 U.S. 94, 97 (1915). See also Armour Packing, 209 U.S. at 81. The doctrine must be strict because any deviation from it has the effect of destroying its nondiscriminatory purpose. The Supreme Court enunciated this point in the strongest terms in Maislin, 497 U.S. at 128 ("Despite the harsh effects of the filed rate doctrine, we have consistently adhered to it"), and reaffirmed that statement recently in Central Office Telephone, 118 S. Ct. at 1963.

## II.    THE FILED TARIFF DOCTRINE BARS PLAINTIFF'S CLAIMS.

Plaintiff's claims are entirely foreclosed by the filed tariff doctrine. It makes no difference that Plaintiff's claims are styled as claims for negligent misrepresentation or deceptive and misleading

---

[3]The nondiscrimination concern behind the filed rate doctrine is equally implicated when the rates are challenged on behalf of a class of customers, as here. See Square D Co. v. Niagara Frontier Tariff Bureau, 476 U.S. 409 (1986); Marcus, 138 F.3d at 61; Wegoland Ltd. v. NYNEX Corp., 27 F.3d 17, 22 (2d Cir. 1994); Sun City Taxpayers' Ass'n v. Citizens Utils. Co., 45 F.3d 58, 62 (2d Cir.), cert. denied, 514 U.S. 1064 (1995).

representations in violation of the DTPA. It also makes no difference whether Plaintiff seeks damages or injunctive relief. The filed tariff doctrine precludes any cause of action challenging the validity of duly filed rates, including claims based on a carrier's alleged deceptive advertising and misrepresentation of its rates, because such deviations dilute the effectiveness of the regulatory system. Indeed, the Supreme Court has "never held that a carrier's unreasonable practice justifies departure from the filed tariff schedule." Maislin Industries, 497 U.S. at 129. Misrepresentation by a carrier about the price of a service or the terms under which it is provided does not justify a departure from the prices and terms set forth in the tariff. Louisville & Nashville R. Co., 237 U.S. at 97. See also Kanuco Tech. Corp. v. Worldcom Network Services, Inc., 979 S.W.2d 368, 374 (Tex. App. – Houston [14th Dist.] 1998, no pet.)(DTPA claim based on alleged willful misconduct and misrepresentations barred by the filed tariff doctrine).

"[E]ven if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." Central Office Telephone, Inc., 118 S. Ct. at 1963. In Central Office Telephone, Inc., the Court rejected respondent's attempt to circumvent the filed tariff doctrine through state law contract and tort claims, noting that "'[t]he rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier.'" Id. at 1965 (quoting Keogh, 260 U.S. at 163). Further, the Court emphasized that the filed tariff doctrine precludes all forms of state law challenges to duly filed rates, even when based on claims of misrepresentation, such as are involved in this case. Id. at 1963. [4]

Marcus v. AT&T Co., 138 F.3d 46 (2d Cir. 1998) involved facts similar to the facts alleged by Plaintiff in this case. Marcus was a class action in which the plaintiff asserted causes of action

---

[4] The Supreme Court also held that claims (such as Plaintiff's) that directly interfere with a filed tariff do not survive the preclusive effect of the filed tariff doctrine under the "Savings Clause" of the Communications Act of 1934, 47 U.S.C. §§ 151 et seq. (the "Communications Act"). As the Court explained, the Savings Clause, 47 U.S.C. § 414, "preserves only those rights that are not inconsistent with the statutory filed-tariff requirements," and claims "that directly conflict with the tariff . . . cannot be 'saved' under § 414." Central Office Tel., 118 S. Ct. at 1965.

for breach of warranty, fraud, negligent misrepresentation, and violation of the New York deceptive acts statute arising out of AT&T's alleged failure to disclose to customers that it rounded up its charges to the next minute. Marcus also involved a claim for injunctive relief. The Second Circuit held that all of the claims asserted were barred by the filed tariff doctrine.

The Second Circuit determined that the filed tariff doctrine "is motivated by two 'companion principles'—(1) preventing carriers from engaging in price discrimination as between ratepayers (the 'nondiscrimination strand') and (2) preserving the exclusive role of federal agencies in approving rates for telecommunications services that are 'reasonable' by keeping courts out of the rate-making process (the 'nonjusticiability strand'), a function that the federal agencies are more competent to perform." Marcus, 138 F.3d at 58 (citations omitted). Marcus held that the claims asserted would violate the nondiscrimination strand of the filed tariff doctrine. Marcus, 138 F.3d at 60. "[I]f the plaintiff[s] were allowed to collect damages because of their purported reliance upon [the carrier's] non-disclosure, they would have won for themselves a reduced rate for their local telephone service. Nonparty subscribers to the same service would of necessity pay a higher rate. Such a 'discriminatory' result cannot be squared with the filed rate doctrine's mandate of equal rates for equal service."[5] Id., quoting Porr v. NYNEX Corp., 230 A.D.2d 564, 660 N.Y.S.2d 440, 446 (1997).

The Second Circuit also held that an award of damages "would violate the nonjusticiability strand of the [filed tariff] doctrine." Marcus, 138 F.3d at 61. In rejecting the argument that an award of damages would not constitute rate making, the Marcus court stated that the "filed rate doctrine prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority." Id. It concluded that it could not "award damages . . . without undermining the authority of the FCC, and therefore, the principle of nonjusticiability." Id. The Court of Appeals

---

[5] Marcus also held that the filed rate doctrine applied in the class action context. Marcus, 138 F.3d at 61 ("nondiscrimination concerns remain viable even in the context of a class action lawsuit").

explicitly rejected the plaintiff's request "to modify the filed rate doctrine to allow nondisclosure claims." Marcus, 138 F.3d at 61. It held that "absent Congressional authorization or direction from the Supreme Court, we are in no position to modify the doctrine." Id. at 62.

As in Marcus, this Court cannot award Plaintiff damages or require WorldCom to alter the manner in which it provides long-distance services without violating the nondiscrimination and nonjusticiability strands of the filed tariff doctrine. An award of damages would have the effect of charging the Plaintiff a different, and therefore discriminatory, rate than other customers for telecommunications services. Thus, any award of damages in this case would violate the nondiscrimination strand of the filed tariff doctrine. Also as in Marcus, the fact that Plaintiff alleges nondisclosure of certain rates and fees does not save her claims because such a theory would have the practical effect of altering the tariffed rate. By her claims, Plaintiff seeks to require WorldCom to make different and additional disclosures concerning rates, fees, and services than the tariff system requires. Such action interferes with the FCC's prerogative to set the reasonable rates and disclosure requirements for common carriers and thus violates the nonjusticiability strand.

Applying these principles, the Seventh Circuit rejected a claim similar to Plaintiff's. In Cahnmann v. Sprint Corp., 133 F.3d 484, a customer of Sprint's "Fridays Free" program filed a class action lawsuit in Illinois state court against Sprint, alleging a breach of contract. The plaintiff alleged that Sprint offered her and members of the class $1,000 worth of free long-distance calls on Fridays to anywhere in the world for one year. Four months into the program, however, Sprint amended its tariff pertaining to the "Fridays Free" program by deleting ten countries from the "anywhere in the world" portion of the program. Plaintiff and several thousand members of the class who continued to place calls to one or more of the deleted countries brought suit to enforce the original tariff, and asserted that Sprint had breached its contract by reneging on its promise to keep the original tariff in force for a full year. Id. at 485. The plaintiff also claimed that Sprint's alleged misrepresentations

concerning the "Fridays Free" program constituted fraud under Illinois common and statutory law. Id. at 490.

The Seventh Circuit affirmed dismissal of both the breach of contract and the fraud claims on the basis of the filed tariff doctrine. Observing that a carrier's federal tariff "is the contract" between that carrier and its customers, the Seventh Circuit held that the filed tariff doctrine prohibits any breach of contract action that seeks to invalidate or change a tariff on the basis of an alleged promise outside the terms of the tariff. Id. at 488 (emphasis added). Likewise, because the plaintiff's purported fraud claim sought exactly the same relief as the breach of contract claim -- to change the tariff by means of a rebate -- the court concluded that the fraud claim was also barred by the filed tariff doctrine. This reasoning applied with equal force to the plaintiff's misrepresentation claims. As the court explained, under the filed tariff doctrine, "even reasonable reliance on a carrier's representation will not allow a suit complaining about the representation to be litigated under state law if the representation concerns a tariffed service." Id. at 490.

As in Cahnmann, Plaintiff cannot avoid the preclusive effect of the filed tariff doctrine by characterizing her suit as an action for negligent misrepresentation and for a violation of the DTPA, rather than what it really is: a direct challenge to WorldCom's filed rates. "The fact that the remedy sought can be characterized as damages for fraud . . . . does not negate the fact that the court would be determining the reasonableness of the rates." Wegoland, 27 F.3d at 21 (quotation omitted). To the extent that she can state a claim for misrepresentations in violation of the DTPA on the part of WorldCom, Plaintiff must proceed in the FCC, not in the courts. Cahnmann, 133 F.3d at 490-91.

Plaintiff asks this Court to enjoin WorldCom from engaging in the acts described in the Petition. This relief is barred by the same reasoning discussed above under Central Office, Marcus and Cahnmann. Plaintiff is essentially requesting that the Court enjoin WorldCom from enforcing the rates, fees and charges explicitly set out in its Tariffs: the exact rates, fees and charges to which

the Communications Act requires it to adhere. WorldCom's Tariffs are the law. See, e.g., Lowden, 306 U.S. at 520; Keogh, 260 U.S. at 163; Carter, 365 F.2d at 496; Cahnmann, 133 F.3d at 488; Western Union Int'l, 41 F.3d at 1496. As the Supreme Court has stated for over three-quarters of a century and reiterated in 1998, "[i]gnornace, or misquotation of rates is not an excuse for paying or charging either less or more than the filed rate." Central Office Tel., 118 S. Ct. at 1963 (quoting Maxwell, 237 U.S. at 97). Once a tariff is properly filed, all customers to a tariffed service are "conclusively presumed" to know the filed rate, Kansas City S. R.R. v. Carl, 227 U.S. 639, 653 (1913); and "must take notice of the rate applicable," id. at 652. Accord Security Servs., Inc. v. Kmart Corp., 511 U.S. 431, 443 (1994); Maislin, 497 U.S. at 127; Marcus, 138 F.3d at 63.

Plaintiff cannot ask this Court to require WorldCom to provide disclosures that differ from statutory obligations mandated by the FCC. The tariff system is public disclosure. It establishes one uniform, national forum where common carriers are required to set out their rates, fees and services in striking detail. Issuing an injunction in this case would undermine the authority of the FCC and the uniformity established by the federal regulatory system. Accordingly, the filed tariff doctrine bars all of Plaintiff's claims as a matter of law and the complaint should be dismissed.

## III.   PLAINTIFF'S CLAIMS ARE PREEMPTED BY THE COMMUNICATIONS ACT.

As set forth in Sections I and II above, all of Plaintiff's claims are barred by the filed tariff doctrine. If this Court finds, however, that the claims are not barred by the filed tariff doctrine, it should dismiss the Petition on the grounds that all of the state law claims asserted by Plaintiff are preempted by the Communications Act. The Communications Act provides the exclusive remedy for claims that a common carrier such as WorldCom has failed to provide tariffed services in a just and reasonable manner. It also provides the exclusive remedy for claims that WorldCom has charged more than permitted by the Tariff. All of Plaintiff's claims substantively allege that WorldCom's procedures are unreasonable and that WorldCom charged excessive tariffed fees and rates.

Accordingly, all of Plaintiff's claims are preempted by the Communications Act and the Petition should be dismissed.

The Communications Act requires WorldCom to provide tariffed services in a "just and reasonable" manner. See 47 U.S.C. § 201(b) ("All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful"). The Communications Act also requires WorldCom to charge rates and provide services as set forth in the Tariffs. See 47 U.S.C. § 203(c) ("no carrier shall . . . extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule").

The Communications Act provides the mechanism for its own enforcement. 47 U.S.C. § 207 provides that "[a]ny person claiming to be damaged by a common carrier . . . may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter." The Communications Act also specifies the remedies available for a violation of the Act. 47 U.S.C. § 206 provides that "[i]n case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, . . . such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation."

The Communications Act preempts the Plaintiff's claims for negligent misrepresentation and violation of the DTPA. All of the allegations asserted by Plaintiff in support of these claims relate to the reasonableness of WorldCom's rates for long-distance service, which is encompassed within the question of whether WorldCom's practices are just and reasonable under 47 U.S.C. § 201(b), or whether WorldCom has overcharged its customers pursuant to 47 U.S.C. § 203(c).

The Tariffs are binding on WorldCom and have the effect of federal law. Cahnmann, 133 F.3d at 488; Western Union Int'l, 41 F.3d at 1496. Plaintiff's negligent misrepresentation and DTPA claims therefore, are nothing more than claims that WorldCom did not conform to its obligations under the federal regulations, a claim governed exclusively by the Communications Act.

In Cahnmann, the plaintiff brought state law claims for breach of contract, fraud, an injunction, and violation of the Illinois Consumer Protection Act. The court held the breach of contract claim was preempted by the Communications Act since the contract was the tariff, which had the force of federal law. Cahnmann, 133 F.3d at 489. It also found that the remaining state law claims were preempted, noting that the "relief sought by the fraud counts is identical to that sought by the contract count." Id. at 490. The court explained that the "victims of Sprint's misrepresentation (if that is what it was) would still have a remedy, only under federal rather than state law, under the same provisions that authorize suits to enforce and to invalidate tariffs . . ." Id.

## IV. PLAINTIFF FAILS TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION OR VIOLATION OF THE DTPA.

If this Court determines that the Plaintiff's claims for negligent misrepresentation and violation of the DTPA are not barred by the filed tariff doctrine and are not preempted by the Communications Act, then it should find that Plaintiff cannot state a claim on these counts because she cannot prove each and every element of her claims as a matter of law.

Two major principles of the filed tariff doctrine prevent Plaintiff from stating claims for negligent misrepresentation and violation of the DTPA. The first principle is the presumed knowledge doctrine. Plaintiff could not reasonably rely on any alleged misrepresentation by WorldCom. Once a tariff is properly filed, all customers to a tariffed service are "conclusively presumed" to know the terms of the tariff. Kansas City S. R.R. v. Carl, 227 U.S. 639, 652-53 (1913); Security Servs., Inc. v. Kmart Corp., 511 U.S. 431, 443 (1994); Maislin, 497 U.S. at 127; Marcus,

138 F.3d at 63. The second principle is that a person who has paid the filed rate has paid the only lawful rate, and thus has no cognizable injury as a matter of law. Morales v. Attorneys' Title Ins. Fund, Inc., 983 F.Supp. 1418, 1428 (S.D.Fla. 1997).

### A.  A person is conclusively presumed to know the contents of the tariff, and cannot show reliance on any misrepresentations to the contrary.

Marcus specifically addressed the presumed knowledge doctrine in the context of state consumer rights legislation and negligent misrepresentation. 138 F.3d at 63. A plaintiff cannot show reasonable reliance on any alleged nondisclosure or misrepresentation as a matter of law because she is presumed to know the contents of the tariff. Marcus, 138 F.3d at 63.

A claim for negligent misrepresentation in Texas requires a showing of reliance on a misrepresentation and a pecuniary loss resulting from such reliance. Smith v. Tilton, 3 S.W.3d 77, 86 (Tex.App.-Dallas 1999, no writ); First Interstate Bank of Tex., N.A. v. S.B.F.I., Inc., 830 S.W.2d 239, 245 (Tex. App.-Dallas 1992, no writ). Because the Plaintiff is conclusively presumed to know the contents of the tariff, and the filed tariff is the law, she could not have relied on any purported misrepresentations of WorldCom.   Thus, the Petition fails to state a claim for negligent misrepresentation.

The presumed knowledge doctrine similarly precludes Plaintiff from proving the element of 'producing cause' in her DTPA claims. A consumer may maintain an action for false, misleading, or deceptive acts under the DTPA only where such acts constitute a producing cause of economic damages or damages for mental anguish. TEX.BUS. & COM.CODE § 17.50(a)(1); Doe v. Boys Club of Greater Dallas, Inc., 907 S.W.2d 472, 478 (Tex. 1995). "A producing cause is a substantial factor which brings about the injury and without which the injury would not have occurred." Doe, 907 S.W.2d at 481. A misrepresentation cannot be a producing cause of injury for purposes of the DTPA where it is not relied upon. Century 21 Real Estate Corp. v. Hometown Real Estate Co., 890 S.W.2d

118, 130 (Tex.Civ.App.-Texarkana 1994, writ denied); <u>citing</u> <u>Celtic Life Ins. Co. v. Coats</u>, 885

S.W.2d 96, 100-01 (Tex.1994) (Enoch, J., concurring)(concluding that producing cause is present

only if misrepresentation is not patently absurd so that reliance is reasonable).   The presumed

knowledge doctrine prevents Plaintiff from proving the element of producing cause as a matter of

law, and thus her Petition fails to state a claim for violation of the DTPA.

> **B.      Because the filed rate is the only lawful rate, Plaintiff suffered no cognizable injury.**

Claims for misrepresentation and violation of the DTPA require a type of loss that Plaintiff

cannot show as a matter of law.   A claim for negligent misrepresentation requires proof of a

*pecuniary loss*.  <u>First Interstate Bank of Tex., N.A.</u>,  830 S.W.2d at 245.  The DTPA allows recovery

only where the Plaintiff has suffered economic damages or mental anguish. TEX.BUS. & COM.CODE

§ 17.50(a)(1).  Plaintiff has "no legal right to pay anything other than the promulgated rates, [she

has] suffered no cognizable injury by virtue of paying said rates." <u>Morales</u>, 983 F.Supp. at 1428.

Even if Plaintiff could show reliance or producing cause, Plaintiff's payment of the filed rate

prevents her from proving she has suffered any injury.   In <u>Stein</u>, the court held that a Kansas

consumer rights statute did not require reliance. <u>Stein</u>, 22 F.Supp.2d at 1215. Nevertheless, the court

in <u>Stein</u> held that Plaintiff failed to state a claim because the payment of the filed rate precluded any

showing of damages. <u>Id</u>. In its original order, the court permitted the claim to proceed, finding the

consumer rights statute did not require actual injury. <u>Stein,</u> 22 F.Supp.2d at 1214. However, on

reconsideration, the court dismissed the claim, holding that injury under the statute is  required, or

the statute would be unconstitutional. <u>Id</u>.

Thus the fact that the filed rate is the only lawful rate affects a Plaintiff's ability to have

standing.  In <u>Morales</u>, the Southern District of Florida dismissed the plaintiffs' petition for lack of

subject matter jurisdiction where the alleged injury was paying overpriced title insurance premiums.

"At the core of the filed rate doctrine is the issue of standing. To invoke the judicial power conferred by Article III of the United States Constitution, a plaintiff must assert an "injury in fact" and, absent such assertion, a federal court lacks jurisdiction." Morales, 983 F. Supp at 1428; citing Sierra Club v. Morton, 405 U.S. 727 (1972).

"Injury" for purposes of Article III standing is the violation of a legal right. Taffet v. Southern Co., 967 F.2d at 1494(11th Circuit 1992)(Claim the plaintiff was charged an excessive rate must be dismissed because no legal right to anything other than the rate in the tariff); see also Sun City Taxpayers' Association v. Citizens Utilities Company, 847 F. Supp. 281 (D. Connecticut 1994)(The filed tariff doctrine "automatically prevents the plaintiff from meeting the specific standing requirements of [the Racketeer Influenced and Corrupt Organizations Act] because plaintiff cannot be said to have suffered an injury to its business or property"). Because the plaintiffs in cases implicating filed rates have no right to pay anything other than the rates set forth in tariffs, they lack injury to confer standing under Article III. Morales, 983 F. Supp. at 1429; see also Stein, 22 F.Supp.2d at 1214.

Plaintiff alleges that she and others who are similarly situated suffered damages because they paid rates and fees in excess of what was advertised. Petition, ¶ 14. However, what Plaintiff paid was the only rate she is legally entitled to pay: the filed rate. As in Morales and Taffet, Plaintiff cannot show she suffered any injury from paying the filed rate and thus the Petition fails to state a claim as a matter of law.

## CONCLUSION

For the foregoing reasons, the First Amended Petition should be dismissed.

Respectfully submitted

John C. Eichman
State Bar No. 06494800
Kerry C. Ahern
State Bar No. 24012195
JENKENS & GILCHRIST
*A Professional Corporation*
1445 Ross Avenue, Suite 3200
Dallas, Texas  75202
Telephone:     (214) 855-4500
Facsimile:      (214) 855-4300

John Alex Huddleston
Texas Bar No. 10148400
JENKENS & GILCHRIST
*A Professional Corporation*
1800 Frost Bank Tower
100 West Houston Street
San Antonio, Texas 78205
Telephone:     (210) 246-5000
Facsimile:      (210) 246-5999

**ATTORNEYS FOR DEFENDANT MCI WORLDCOM   COMMUNICATIONS, INC.**

OF COUNSEL:
Thomas F. O'Neil
William E. Smith
WORLDCOM, INC.
Law and Public Policy
1133 19th Street, N.W.
Washington, D.C. 20036
Telephone:     (202)736-6612
Facsimile:      (202) 736-6482

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was served on the following counsel of record by hand delivery, on this _4th_ day of October, 2000:

Richard C. Jaramillo
Ray L. Vela
Law Offices of Richard Jaramillo &
 Associates, P.C.
1412 Main Street, 22nd Floor
Dallas, Texas 75202
(214) 744-3364
(214) 748-6603 - fax

MCI TELECOMMUNICATIONS CORPORATION

TARIFF F.C.C. NO. 1
2ND REVISED PAGE NO. 19.1.3.1.1.4.7
CANCELS 1ST REVISED PAGE NO. 19.1.3.1.1.4.7

CUSTOMIZED BUSINESS COMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTIONS AND RATES

3. METERED USE SERVICE (Cont.)

.02 Option A (Executual) (Cont.)

.025 Premier Calling Plans (Cont.)

.02521 MCI One Savings Plan II

A variation of Option A (Executual), MCI One Savings Plan II offers calling within the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Guam and CNMI.

A $5.00 per-account per-month minimum charge will apply if a customer's total MCI One Savings Plan II usage charges are less than $5.00 per account per month. The $5.00 charge is applied against MCI One Savings Plan II usage in the month it is charged.

For all MCI One Savings Plan II Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI, customers will be charged the following per-minute rates based on rate period:

| Rate Period | Per-Minute Rate |
|-------------|-----------------|
| Peak | $0.25 |
| Off-Peak | 0.10 |
| Saturday | 0.10 |
| Sunday | 0.05 |

The following Time of Day rate periods apply for domestic MCI One Savings Plan II Dial "1" usage: the Peak rate period applies from 7:00 a.m. to 6:59 p.m. Monday through Friday; the Off-Peak rate period applies from 7:00 p.m. to 6:59 a.m. Monday through Friday; the Saturday rate period applies to all day Saturday; and the Sunday rate period applies to all day Sunday.

Customers will be charged $0.40 per minute for all Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), and Metered Use Service Option T (Feature Card Services) calls which originate in the U.S. Mainland, Alaska, Hawaii and the U.S. Virgin Islands and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI. In addition, for the customer's Option B, Option D, and Option T calls which terminate to a customer's billed ANI, the customer will be charged $0.25 per-minute for calls made between 7:00 a.m. to 6:59 p.m. Monday through Friday; $0.10 per-minute for calls made between 7:00 p.m. to 6:59 a.m. Monday through Friday and all day Saturday; and $0.05 per-minute for calls made all day Sunday. Calling card access surcharges will not apply.

The charges set forth in Section C-3.07337 will apply for calls for Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the international locations set forth in Section C-3.07337. Customers enrolled in this plan are eligible to subscribe to the Option A International Savings Plan 2 described in Section C-3.0252.3.

The subscriber will be automatically enrolled in Personal 800 Plan R, Option 3, as described in Section C-3.02122. The one-time installation fee and monthly subscription fee will be waived.

N
I
N

ISSUED: February 12, 1998          ISSUED BY:          James E. Kerr          EFFECTIVE: February 13, 1998
Manager, Federal Tariffs
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

MCI TELECOMMUNICATIONS CORPORATION

TARIFF F.C.C. NO. 1
3RD REVISED PAGE NO. 19.1.3.1.1.4.7
CANCELS 2ND REVISED PAGE NO. 19.1.3.1.1.4.7

## CUSTOMIZED BUSINESS COMMUNICATIONS SERVICE

### SECTION C - SERVICE DESCRIPTIONS AND RATES

3.  METERED USE SERVICE (Cont.)

   .02  Option A (Execunet) (Cont.)

      .025  Premier Calling Plans (Cont.)

         .02521  MCI One Savings Plan II

A variation of Option A (Execunet), MCI One Savings Plan II offers calling within the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Guam and CNMI.

A $5.00 per-account per-month minimum charge will apply if a customer's total MCI One Savings Plan II usage charges are less than $5.00 per account per month. The $5.00 charge is applied against MCI One Savings Plan II usage in the month t is charged.

For all MCI One Savings Plan II Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI, customers will be charged the following per-minute rates based on rate period:

| Rate Period | Per Minute Rate |
|---|---|
| Peak | $0.25 |
| Off-Peak | 0.10 |
| Saturday | 0.10 |
| Sunday | 0.05 |

The following Time of Day rate periods apply for domestic MCI One Savings Plan II Dial "1" usage: the Peak rate period applies from 7:00 a.m. to 6:59 p.m. Monday through Friday; the Off-Peak rate period applies from 7:00 p.m. to 6:59 a.m. Monday through Friday; the Saturday rate period applies to all day Saturday; and the Sunday rate period applies to all day Sunday.

Customers will be charged $0.45 per minute for all Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), and Metered Use Service Option T (Feature Card Services) calls which originate in the U.S. Mainland, Alaska, Hawaii and the U.S. Virgin Islands and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI. In addition, for the customer's Option B, Option D, and Option T calls which terminate to a customer's billed ANI, the customer will be charged $0.25 per-minute for calls made between 7:00 a.m. to 6:59 p.m. Monday through Friday; $0.10 per-minute for calls made between 7:00 p.m. to 6:59 a.m. Monday through Friday and all day Saturday; and $0.05 per-minute for calls made all day Sunday. Calling card access surcharges will not apply.

The charges set forth in Section C-3.07337 will apply for calls for Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the International locations set forth in Section C-3.07337. Customers enrolled in this plan are eligible to subscribe to the Option A International Savings Plan 2 described in Section C-3.025.3.

The subscriber will be automatically enrolled in Personal 800 Plan R, Option 3, as described in Section C-3.02122. The one-time installation fee and monthly subscription fee will be waived.

ISSUED: April 30, 1998

ISSUED BY:   James E. Kerr
Manager, Federal Tariffs
1801 Pennsylvania Avenue, N.W.
Washington, D.C.  20006

EFFECTIVE: May 1, 1998

MCI TELECOMMUNICATIONS CORPORATION

TARIFF F.C.C. NO. 1
4TH REVISED PAGE NO. 19.1.3.1.1.4.7
CANCELS 3RD REVISED PAGE NO. 19.1.3.1.1.4.7

## CUSTOMIZED BUSINESS COMMUNICATIONS SERVICE

### SECTION C - SERVICE DESCRIPTIONS AND RATES

3.    **METERED USE SERVICE (Cont.)**

    .02    **Option A (Execunet) (Cont.)**

        .025    **Premier Calling Plans (Cont.)**

           .02521    <u>MCI One Savings Plan II:</u>  A variation of Option A (Execunet), MCI One Savings Plan II offers calling within the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Guam and CNMI.

                A $5.00 per-account per-month minimum charge will apply if a customer's total MCI One Savings Plan II usage charges are less than $5.00 per account per month.  The $5.00 charge is applied against MCI One Savings Plan II usage in the month it is charged.

                For all MCI One Savings Plan II Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI, customers will be charged the following per minute rates based on rate period:

| Rate Period | Per-Minute Rate |
|---|---|
| Peak | $0.25 |
| Off-Peak | 0.10 |
| Saturday | 0.10 |
| Sunday | 0.05 |

                The following Time of Day rate periods apply for domestic MCI One Savings Plan II Dial "1" usage: the Peak rate period applies from 7:00 a.m. to 6:59 p.m. Monday through Friday; the Off-Peak rate period applies from 7:00 p.m. to 6:59 a.m. Monday through Friday; the Saturday rate period applies to all day Saturday; and the Sunday rate period applies to all day Sunday.

                Customers who subscribe to MCI One Savings Plan II will be automatically enrolled in Calling Card Option 1, as described in Section C-3.02525.    (C)(C)

                The charges set forth in Section C-3.07337 will apply for calls for Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the international locations set forth in Section C-3.07337.  Customers enrolled in this plan are eligible to subscribe to the Option A International Savings Plan 2, as described in Section C-3.07523.    (T)

                The subscriber will be automatically enrolled in Personal 800 Plan R, Option 3, as described in Section C-3.02122.  The one-time installation fee and monthly subscription fee will be waived.

ISSUED:  June 11, 1999       ISSUED BY:    James E. Kerr
                                  Manager, Federal Tariffs
                                  1801 Pennsylvania Avenue, N.W.
                                  Washington, D.C. 20006        EFFECTIVE:  June 12, 1999

MCI WORLDCOM COMMUNICATIONS, ...

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1. GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

.06 GENERAL CHARGES:

.061 Subscriber Charges: Pursuant to Section B-6.16, the following charges and other provisions will apply, as specified below. The charges will: (i) be calculated after the application of promotional and other accounts; (ii) not be eligible to receive promotional or any other discounts; (iii) not be included to determine satisfaction of usage volume requirements; (iv) be calculated based upon the rates shown below in Section C-1.0612 as applied to the customer's total interstate and international usage, unless otherwise specified; (v) not apply to tax, tax-like, and/or tax-related surcharges as described in Sections B-7.08 and B-7.12; and, (vi) not apply to calls using Telecommunications Relay Service (TRS) or calls originated by customers with qualified hearing or speech impairments who are certified as described in Section C-3.02112. (For purposes of this Section C-1.061 only: (1) "usage charges" means all tariffed charges appearing on a customer's invoice; and (2) "line" means a connection furnished by a Local Exchange Carrier that is presubscribed to the Company for the purpose of accommodating Customer traffic subject to this Tariff.

.0611 The following charges will apply:

.06111 Carrier Access Charge:

.061111 A monthly $1.46 charge[1] per account will be applied to invoices of customers of Metered Use Service Option A (Execunet) and Metered Use Service Option NN (homeMCI One).

.061112 A monthly $2.65 charge per ANI which is presubscribed to MCI WORLDCOM service will be applied to invoices of customers of Metered Use Service Option N (Prism Plus), Metered Use Service Option R (MCI Preferred), Metered Use Service Option U (Commercial Dial 1 Service), Metered Use Service Option EE (MCI Flat Rate), Metered Use Service Option JJ (Advanced Option I for Small Business), Metered Use Service Option KK (MCI Flat Rate Plus) and Metered Use Service Option OO (Advanced Option II for Small Business).     R

.06112 National Access Fee (NAF):

.061121 A monthly $3.65 charge per line which is presubscribed to MCI WORLDCOM service and which accesses MCI WORLDCOM service via switched access will be applied to invoices of customers of Metered Use Service Option C (MCI WATS), Metered Use Service Option G (Vnet), Metered Use Service Option I (MCI Prism II), Metered Use Service Option J (University WATS), Metered Use Service Option Q (MCI Vision), Metered Use Service Option W (MCI MASTERS), Metered Use Service Option X (MCI HotelDirect), Metered Use Service Option BB, Metered Use Service Option CC (University Dial 1), Metered Use Service Option HH (hospitalityMCI), Metered Use Service Option MM (networkMCI One), Metered Use Service Option PP (Masters97) and Metered Use Service Option RR (MCI WORLDCOM On-Net Services).     R

---

[1]  For monthly billing periods beginning on or after July 1, 2000, this Carrier Access Charge will not apply. For monthly billing periods beginning before July 1, 2000, this Carrier Access Charge will be applied, irrespective of the invoice date or the date the invoice is received by Customer.

Issued: July 31, 2000                                                                 Effective: August 1, 2000

Issued by:   Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

MCI WORLDCOM COMMUNICATIONS, INC.

TARIFF F.C.C NO. 1
1ST REVISED PAGE NO. 290
CANCELS ORIGINAL PAGE NO. 290

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1.   GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

.06     GENERAL CHARGES (Continued):

.061     Subscriber Charges (Continued):

.0611

.06112   National Access Fee (NAF) (Continued):

.061122   A monthly $0.41 charge per line which is presubscribed to MCI WORLDCOM     R
service and which accesses MCI WORLDCOM service via Local Exchange
Carrier-provided Centrex will be applied to invoices of customers of Metered
Use Service Option C (MCI WATS), Metered Use Service Option G (Vnet),
Metered Use Service Option H (MCI Prism I), Metered Use Service Option I
(MCI Prism II), Metered Use Service Option J (University WATS), Metered Use
Service Option Q (MCI Vision), Metered Use Service Option W (MCI
MASTERS), Metered Use Service Option X (MCI HotelDirect), Metered Use
Service Option BB, Metered Use Service Option CC (University Dial 1),
Metered Use Service Option HH (hospitalityMCI), Metered Use Service Option
MM (networkMCI One), Metered Use Service Option PP (Masters97) and
Metered Use Service Option RR (MCI WORLDCOM On-Net Services).

.061123   A monthly $0.76 charge per line which is presubscribed to MCI WORLDCOM     R
service and which accesses MCI WORLDCOM service via Local Exchange
Carrier-provided Primary Rate Interface (PRI) will be applied to invoices of
customers of Metered Use Service Option C (MCI WATS), Metered Use
Service Option G (Vnet), Metered Use Service Option H (MCI Prism I), Metered
Use Service Option I (MCI Prism II), Metered Use Service Option J (University
WATS), Metered Use Service Option Q (MCI Vision), Metered Use Service
Option W (MCI MASTERS), Metered Use Service Option X (MCI HotelDirect),
Metered Use Service Option CC (University Dial 1), Metered Use Service
Option HH (hospitalityMCI), Metered Use Service Option MM (networkMCI
One), Metered Use Service Option PP (Masters97) and Metered Use Service
Option RR (MCI WORLDCOM On-Net Services).

---

Issued:  July 31, 2000

Effective:  August 1, 2000

Issued by:     Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C.  20006

MCI WORLDCOM COMMUNICATION, C.

TARIFF F.C.C NO. 1
ORIGINAL PAGE NO. 291

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1. GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

.06 GENERAL CHARGES:

.061 Subscriber Charges (Continued):

.0611 National Access Fee (NAF) (Continued):

.06113 Other Provisions: The following additional provisions will apply:

.061131 For any customer which has executed a Special Customer Arrangement (SCA) before January 1, 1998, which SCA subsequently became effective and either (i) expressly forecloses any increase in charges for the services set forth in Sections C-1.061112 and C-1.06112, or (ii) contains a provision that limits by capping any increase in charges for the services set forth in Sections C-1.061112 and C-1.06112, the charges set forth in Sections C-1.061112 and C-1.06112 shall not apply during: (i) the remainder of the original term of service, so long as the rates and charges, including regulations that affect rates and charges, for the services set forth in Sections C-1.061112 and C-1.06112 are not modified; and, (ii) any optional term of service following the original term of service which the SCA permits the customer to invoke by unilateral action, so long as the rates and charges, including regulations that affect rates and charges for the services set forth in C-1.061112 and C-1.06112 are not modified. Otherwise, these charges will apply at the beginning of any new SCA term of service, including any month-to-month term of service, following the expiration of any original or optional service term.

.0611311 An SCA may be amended to add a service (with service features) not being furnished under the SCA and the charges set forth in Sections C-1.061112 and C-1.06112 shall not apply to the amended SCA so long as the requirements set forth in (i) and (ii) of Section C-1.061131 above continue to be met. Otherwise, such referenced charges will apply at the beginning of any new SCA term of service, including any month-to-month term of service, following the expiration of any original or optional service term, or the first monthly billing period following the amendment of the SCA to add new service. If the service added is Metered Use Service Option RR (MCI WorldCom On-Net Services), including Local Network Connection, and such service is being substituted for Metered Use Service Options F (MCI 800 Service), G (Vnet), Q (MCI Vision) and/or MM (networkMCI One), and, further, if the customer subscribes to new, non-resold, exchange service provided by an affiliate of the Company, the charges set forth in Sections C-1.061112 and C-1.06112 shall not apply if the customer pays charges for the substituted service that equal or exceed the charges for the service substituted for, after application of all discounts or credits, and independent of any new Option RR service or service features to which the customer subscribes.

Issued: March 7, 2000

Effective: March 8, 2000

Issued by: Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

MCI WORLDCOM COMMUNICATIONS, ...   TARIFF F.C.C NO. 1
ORIGINAL PAGE NO. 293

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1.   GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

.06   GENERAL CHARGES (Continued):

.061   Subscriber Charges (Continued):

.0612 Federal Universal Service Fee (FUSF)[1]:

.0612111   For MCI WORLDCOM service usage between July 1, 1999 and March 31, 2000, a charge equal to 7.2 percent of MCI WORLDCOM service usage charges will be applied to invoices of customers of Metered Use Service Option A (Execunet), Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), Metered Use Service Option T (Feature Card Services) and Metered Use Service Option NN (homeMCI One).

.0612112   Beginning April 1, 2000, a charge equal to 8.3 percent of MCI WORLDCOM service usage charges will be applied to invoices of customers of Metered Use Service Option A (Execunet), Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), Metered Use Service Option T (Feature Card Services) and Metered Use Service Option NN (homeMCI One).

.0612112

.06121121   Beginning July 1, 1999, a charge equal to 6.5 percent of MCI WORLDCOM service usage charges will be applied to invoices of customers of Metered Use Service Option N (Prism Plus), Metered Use Service Option R (MCI Preferred), Metered Use Service Option U (Commercial Dial 1 Service), Metered Use Service Option EE (MCI Flat Rate), Metered Use Service Option JJ (Advanced Option I for Small Business), Metered Use Service Option KK (MCI Flat Rate Plus), and Metered Use Service Option OO (Advanced Option II for Small Business).

---

[1]   The Federal Universal Service Fee will either be included as a component of individual call charges on a customer's invoice or it may be included as part of a separate line item on a customer's invoice.

---

Issued: March 7, 2000                                        Effective: March 8, 2000

Issued by:   Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

MCI WORLDCOM COMMUNICATIONS, . .;.

TARIFF F.C.C NO. 1
ORIGINAL PAGE NO. 297

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1.    GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

.061    Subscriber Charges (Continued):

.0612 Federal Universal Service Fee (FUSF) (Continued):

.06121 Charges (Continued):

.061212 (Continued)

.0612122 For MCI WORLDCOM service usage between July1, 1999 and October 31, 1999, a charge equal to 4.5 percent of MCI WORLDCOM service usage charges will apply to customers of Dedicated Leased Line Service, Metered Use Service Option C (MCI WATS), Metered Use Service Option F (MCI 800 Service), Metered Use Service Option G (Vnet), Metered Use Service Option H (MCI Prism I), Metered Use Service Option I (MCI Prism II), Metered Use Service Option J (University WATS), Metered Use Service Option M (MCI 900 Service), Metered Use Service Option P (MCI Forum Conference Calling), Metered Use Service Option Q (MCI Vision), Metered Use Service Option S (Virtual Private Data Services), Metered Use Service Option W (MCI MASTERS), Metered Use Service Option X (MCI HotelDirect), Metered Use Service Option Y (MCI PrePaid), Metered Use Service Option Z (MCI Exchange Card), Metered Use Service Option BB, Metered Use Service Option CC (University Dial 1), Metered Use Service Option DD (Third Party Debit Instrument Service), Metered Use Service Option FF (CFRS), Metered Use Service Option GG (MCI HyperStream Frame Relay), Metered Use Service Option HH (hospitalityMCI), Metered Use Service Option II (MCI Hemispheres International Calling Card), Metered Use Service Option LL (directlineMCI), Metered Use Service Option MM (networkMCI One), Metered Use Service Option PP (Masters97), Metered Use Service Option QQ (audioconferencing from networkMCI Conferencing), Metered Use Service Option RR (MCI WORLDCOM On-Net Services), CCSA Service, Extension Point Service, Multiple Access Data Collection Service, Program Channel Service and Wideband Service.

Issued: March 7, 2000

Effective: March 8, 2000

Issued by:    Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1.    GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

   .06    GENERAL CHARGES (Continued):

      .061    Subscriber Charges (Continued):

         .0612 Federal Universal Service Fee (FUSF) (Continued):

            .06121 Charges (Continued):

               .0612123 Beginning November 1, 1999, a charge equal to 5.95 percent of MCI WORLDCOM service usage charges will apply to customers of Dedicated Leased Line Service, Metered Use Service Option C (MCI WATS), Metered Use Service Option F (MCI 800 Service), Metered Use Service Option G (Vnet), Metered Use Service Option H (MCI Prism I), Metered Use Service Option I (MCI Prism II), Metered Use Service Option J (University WATS), Metered Use Service Option M (MCI 900 Service), Metered Use Service Option P (MCI Forum Conference Calling), Metered Use Service Option Q (MCI Vision), Metered Use Service Option S (Virtual Private Data Services), Metered Use Service Option W (MCI MASTERS), Metered Use Service Option X (MCI HotelDirect), Metered Use Service Option Y (MCI PrePaid), Metered Use Service Option Z (MCI Exchange Card), Metered Use Service Option BB, Metered Use Service Option CC (University Dial 1), Metered Use Service Option DD (Third Party Debit Instrument Service), Metered Use Service Option FF (CFRS), Metered Use Service Option GG (MCI HyperStream Frame Relay), Metered Use Service Option HH (hospitalityMCI), Metered Use Service Option II (MCI Hemispheres International Calling Card), Metered Use Service Option LL (directlineMCI), Metered Use Service Option MM (networkMCI One), Metered Use Service Option PP (Masters97), Metered Use Service Option QQ (audioconferencing from networkMCI Conferencing), Metered Use Service Option RR (MCI WORLDCOM On-Net Services), CCSA Service, Extension Point Service, Multiple Access Data Collection Service, Program Channel Service and Wideband Service.

      .06121    Other Provisions: The following additional provisions will apply:

         .061231 A customer will not be required to pay the charges set forth in Section C-1.06121 if it demonstrates to MCI WORLDCOM's reasonable satisfaction that it is acquiring MCI WORLDCOM's services for resale, i.e., not for its own internal use.

Issued: March 7, 2000                                                    Effective: March 8, 2000

Issued by:    Tariff Administrator
              1801 Pennsylvania Avenue, N.W.
              Washington, D.C. 20006

CutePDF - www.fenito.com

MCI WORLDCOM COMMUNICATIC   INC.

TARIFF F.C.C NO. 1
ORIGINAL PAGE NO. 378

## TELECOMMUNICATIONS SERVICE
### SECTION C - SERVICE DESCRIPTIONS AND RATES

3.   **METERED USE SERVICE (Continued)**

.02   **Option A (Execunet) (Continued)**

.025   **Premier Calling Plans:**  Execunet customers (Dial "1" only) may enroll in one or more of the following plans per telephone number at the same time. Those customers who enroll in more than one plan at the same time are limited to a combination of: (1) one interstate, one intrastate, and/or one international plan in any one month or, (2) two international plans in any one month. TRS calls are not eligible for discounting under Premier Calling Plans. All Premier Calling Plans are limited to three telephone numbers per account. Direct dialed calls will be billed at the Premier Calling Plan rates listed herein, unless the customer would otherwise be billed at a lower rate as specified in Section C-3.021111 for a call during the same time period, excluding the first hour for the PrimeTime, PrimeTime Plus, MCI AnyTime, SuperSaver and Sure-Save Options and excluding the MCI Sure Savings Option.

In each monthly period in which a subscriber's usage charges under a Premier Calling Plan (excluding Basic Calling Plan Option 2, Basic Calling Plan Option 3, Basic Calling Plan Option 8, Basic Calling Plan Option 9, Basic Calling Plan Option 11, Basic Calling Plan Option 12, MCI AnyTime, MCI Family Assist, PrimeTime Plus, Sure-Save Area Code Option, Sure-Save Close, Sure-Save Reach, Sure-Save Savings Volume Discount Plan, Sure-Save Sense and Sure-Save Volume Discount Plan) are less than $5.00, a $5.00 minimum charge will apply. This charge will be applied against the customer's Premier Calling Plan usage in the month it is charged.

When a domestic Dial "1" call under a Premier Calling Plan (excluding Sure-Save Volume Discount Plan, Sure-Save Savings Volume Discount Plan, and Sure-Save Reach) begins in one time-of-day rate period and ends in another, the rate in effect for the rate period in which the call begins applies to the entire call.

---

Issued: March 7, 2000

Effective: March 8, 2000

Issued by:   Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C.  20006

MCI WORLDCOM COMMUNICATION_, .NC.

TARIFF F.C.C NO. 1
2ND REVISED PAGE NO. 397
CANCELS 1ST REVISED PAGE NO. 397

TELECOMMUNICATIONS SERVICE
SECTION C - SERVICE DESCRIPTIONS AND RATES

3.   METERED USE SERVICE (Continued)

   .02   Option A (Execunet) (Continued)

      .025   Premier Calling Plans (Continued)

         .02510   Basic Calling Plan Options (Continued):                                    Z

            .0251013 Basic Calling Plan Option 11[1]: A variation of Option A (Execunet), Basic Calling Plan Option 11 offers calling from the U.S. Mainland and Hawaii to the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Puerto Rico, Guam, CNMI and the International locations set forth in Section C-3.07337. Customers enrolled in this plan will be charged a $4.95 monthly recurring charge.                                    Z

            Beginning February 5, 2000 customers of Basic Calling Plan Option 11 will receive service under Basic Calling Plan Option 12

            Benefits: Customers enrolled in this plan will receive the following benefits.

               Dial "1" Access: Customers will be charged $0.10 per minute from 7:00 a.m. through 6:59 p.m. on Mondays through Fridays and $0.05 per minute from 7:00 p.m. through 6:59 a.m. on Mondays through Fridays and all day Saturdays and Sundays for Dial "1" usage which originates in the U.S. Mainland and Hawaii and terminates in the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Puerto Rico, Guam, and CNMI.

               Customers will be charged the rates set forth in Section C-3.07337 for Dial "1" usage which originates in the U.S. Mainland and Hawaii and terminates in the international locations set forth in C-3.07337. Customers enrolled in this plan who also enroll in Option A International Savings Plan 4 (ISP4), as set forth in Section C-3.02526, or Option A International Savings Plan 6 (ISP6), as set forth in Section C-3.02528 will be charged the rates set forth in those Sections for Dial "1" usage that originates in the U.S. Mainland and Hawaii and terminates in the international locations set forth in those Sections.

               Calling Card Access: Customers enrolled in this plan will be charged $0.69 per minute, and a $1.25 per-call surcharge in lieu of the standard tariffed calling card access surcharge, for domestic Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card) and Metered Use Service Option T (Feature Card Services) usage, excluding the customer's usage which terminates to the customer's billed ANI. Customers, excluding customers who are enrolled in Option A International Savings Plan 7, as set forth in Section C-3.02529, or Option A International Savings Plan 8, as set forth in Section C-3.02530, will be charged $0.07 per-minute on Mondays through Saturdays and $0.05 per-minute on Sundays, and the Company will waive the 25 per-call calling card access surcharge, for domestic Option B, Option D, and Option T usage.

               Personal 800 Access: Customers enrolled in this plan will be automatically enrolled in Personal 800 Plan R, Option 3, as set forth in Section C-3.0212. The one-time installation fee and monthly subscription fee will be waived.

---

[1]   Beginning January 22, 2000, service under Basic Calling Plan Option 11 is not available to new subscribers to the plan.

---

Issued: May 11, 2000

Issued by:   Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Effective: May 12, 2000

MCI WORLDCOM COMMUNICATIONS,

TARIFF F.C.C NO. 1
6TH REVISED PAGE NO. 398
CANCELS 5TH REVISED PAGE NO. 398

TELECOMMUNICATIONS SERVICE
SECTION C - SERVICE DESCRIPTIONS AND RATES

3.   METERED USE SERVICE (Continued)

 .02   Option A (Execunet) (Continued)

  .025   Premier Calling Plans (Continued)

   .02510   Basic Calling Plan Options (Continued):

    .0251014 Basic Calling Plan Option 12:  A variation of Option A (Execunet), Basic Calling Plan Option 12 offers calling from the U.S. Mainland and Hawaii to the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Puerto Rico, Guam, CNMI and the international locations set forth in Section C-3.07337. Customers enrolled in this plan will be charged a $5.95 monthly recurring charge.

Benefits:  Customers enrolled in this plan will receive the following benefits.

Customers, excluding customers who are enrolled in Option A International Savings Plan 7, as set forth in Section C-3.02529, or Option A International Savings Plan 8, as set forth in Section C-3.02530, will be charged $0.09 per minute from 7:00 a.m. through 6:59 p.m. on Mondays through Fridays and $0.05 per minute from 7:00 p.m. through 6:59 a.m. on Mondays through Fridays and all day Saturdays and Sundays for the customer's domestic Dial "1" usage and the customer's domestic Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), and Metered Use Service Option T (Feature Card Services) usage which terminates to the customer's billed ANI.  The Company will waive the per-call calling card access surcharge for the customer's domestic Option B, Option D, and Option T usage which terminates to the customer's billed ANI.  Customers will be charged $0.75 per minute, and a $1.25 per-call surcharge in lieu of the standard tariffed calling card access surcharge, for domestic Option B Option D, and Option T usage, excluding the customer's usage which terminates to the customer's billed ANI.

When a domestic Basic Calling Plan Option 12 Dial "1" call is established in one time-of-day rate application period and ends in another, the rate in effect in the rate period in which the call begins applies to the entire call.

Customers will be charged the rates set forth in Section C-3.07337 for Dial "1" usage which originates in the U.S. Mainland and Hawaii and terminates in the international locations set forth in C-3.07337. Customers enrolled in this plan who also enroll in Option A International Savings Plan 4 (ISP4), as set forth in Section C-3.02526, or Option A International Savings Plan 6 (ISP6), as set forth in Section C-3.02528, Option A International Savings Plan 7 (ISP7), as set forth in Section C-3.02529, or Option A International Savings Plan 8 (ISP8), as set forth in Section C-3.02530, will be charged the rates set forth in those Sections for Dial "1" usage which originates in the U.S. Mainland and Hawaii and terminates in the international locations set forth in those Sections.

Personal 800 Access: Customers enrolled in this plan will be automatically enrolled in Personal 800 Plan R, Option 3, as set forth in Section C-3.0212. The one-time installation fee and monthly subscription fee will be waived.

Case 1:00-cv-00148  Document 7  Filed in TXSD on 10/05/2000  Page 37 of 38

TELECOMMUNICATIONS SERVICE
SECTION C - SERVICE DESCRIPTIONS AND RATES

3.    METERED USE SERVICE (Continued)

.07    INTERNATIONAL SERVICE (Continued)

.073    Usage Rates

.07337    Option A (Execunet) Basic Calling Plan Option 5, Basic Calling Plan Option 6, Basic Calling Plan    T
Option 7, Basic Calling Plan Option 8, Basic Calling Plan Option 9, Basic Calling Plan Option 10,    |
Basic Calling Plan Option 11, Basic Calling Plan Option 12, Basic Calling Plan Option 13, Basic    |
Option 14, Domestic Savings Calling Plan, MCI One Savings Plan II, Option NN (homeMCI    |
One) and Option OO (Advanced Option II for Small Business):  For Metered Use Service Option A    T
(Execunet) Basic Calling Plan Option 5, Basic Calling Plan Option 6, Basic Calling Plan Option 7,
Basic Calling Plan Option 8, Basic Calling Plan Option 9, Basic Calling Plan Option 10, Basic Calling
Plan Option 11, Basic Calling Plan Option 12, Basic Calling Plan Option 13, Basic Calling Plan
Option 14, Domestic Savings Calling Plan and MCI One Savings Plan II, Metered Use Service
Option NN (homeMCI One) and Metered Use Service Option OO (Advanced Option II for Small
Business) Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the following
international locations, the following per-minute usage charges will apply during all times of day.
Option A (Execunet) Basic Calling Plan Option 6, Option A (Execunet) Domestic Savings Calling
Plan and Option A (Execunet) MCI One Savings Plan II usage will be calculated on a 60-second
minimum duration basis with additional 60-second increments.  Option NN usage will be calculated
on a 60-second minimum duration basis with additional 6-second increments; Option OO usage will
be calculated on a 30-second minimum duration basis with additional 6-second increments; except
both Option NN and Option OO usage to the Atlantic, Pacific, and Indian Ocean Inmarsat Standard A
Service locations will be calculated on a 60-second minimum duration basis with additional 60-
second increments.

| Country | Rate | Country | Rate | Country | Rate |
|---|---|---|---|---|---|
| Afghanistan | $10.19 | Brazil | $2.53 | Ecuador | $2.60 |
| Albania | 4.81 | British Virgin Islands | 2.02 | Egypt | 3.06 |
| Algeria | 3.09 | Brunei | 2.72 | El Salvador | 2.45 |
| American Samoa | 0.50 | Bulgaria | 2.82 | Equatorial Guinea | 5.94 |
| Andorra | 2.02 | Burkina Faso | 4.66 | Eritrea | 3.67 |
| Angola | 6.29 | Burundi | 6.28 | Estonia | 3.95 |
| Anguilla | 2.14 | Cambodia | 5.74 | Ethiopia | 3.62 |
| Antarctica (Casey, Davis, | | Cameroon | 3.07 | Faeroe Islands | 1.85 |
| Mawson, and Macquarie | | Canada | 0.73 | Falkland Islands | 5.28 |
| Island) | 6.33 | Cape Verde Islands | 3.75 | Fiji Islands | 3.72 |
| Antarctica (Scott Base) | 2.65 | Cayman Islands | 2.14 | Finland | 1.97 |
| Antigua (Barbuda) | 2.08 | Central African | | France | 1.80 |
| Argentina | 2.63 | Republic | 6.04 | French Antilles  (Including | |
| Armenia | 3.46 | Chad | 7.03 | Martinique, St. Barthelemy | |
| Aruba | 2.00 | Chile | 2.44 | and St. Martin) | 2.06 |
| Ascension Island | 3.50 | China | 3.63 | French Guiana | 2.35 |
| Australia (Including | | Christmas Island | 2.07 | French Polynesia | 3.23 |
| Tasmania) | 2.07 | Cocos Islands | 2.07 | Gabon | 3.04 |
| Austria | 1.99 | Colombia | 2.58 | Gambia | 2.86 |
| Azerbaijan | 3.39 | Comoros | 5.89 | Georgia | 3.46 |
| Bahamas | 1.62 | Congo | 5.12 | Germany | 1.69 |
| Bahrain | 2.82 | Cook Islands | 6.46 | Ghana | 3.03 |
| Bangladesh | 4.83 | Costa Rica | 2.28 | Gibraltar | 2.37 |
| Barbados | 2.08 | Croatia | 2.43 | Greece | 2.65 |
| Belarus | 3.46 | Cuba | 2.60 | Greenland | 2.56 |
| Belgium | 2.09 | Cyprus | 2.53 | | |
| Belize | 2.58 | Czech Republic | 2.64 | | |
| Benin | 2.84 | Denmark | 1.98 | | |
| Bermuda | 1.75 | Diego Garcia | 4.86 | | |
| Bhutan | 7.28 | Djibouti | 4.40 | | |
| Bolivia | 2.74 | Dominica | 2.25 | | |
| Bosnia-Herzegovina | 2.47 | Dominican Republic | 2.24 | | |
| Botswana | 2.57 | Easter Island[1] | 2.44 | | |

M

M

---

[1]  Service to this country is available only with the assistance of an operator.

CERTAIN MATERIAL PREVIOUSLY LOCATED ON THIS PAGE CAN NOW BE FOUND ON 4TH REVISED PAGE NO. 737.

Issued: May 11, 2000                                                                                      Effective: May 12, 2000

Issued by:    Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C.  20006

MCI WORLDCOM COMMUNICATIONS, INC.

TELECOMMUNICATIONS SERVICE
SECTION C - SERVICE DESCRIPTIONS AND RATES

3.   METERED USE SERVICE (Continued)

   .07   INTERNATIONAL SERVICE (Continued)

      .073   Usage Rates

         .07337   Option A (Execunet) Basic Calling Plan Option 5, Basic Calling Plan Option 6, Basic Calling Plan Option 7, Basic Calling Plan Option 8, Basic Calling Plan Option 9, Basic Calling Plan Option 10, Basic Calling Plan Option 11, Basic Calling Plan Option 12, Basic Calling Plan Option 13, Basic Calling Plan Option 14, Option A (Execunet) Domestic Savings Calling Plan, Option A (Execunet) MCI One Savings Plan II, Option NN (homeMCI One) and Option OO (Advanced Option II for Small Business) (Continued):

| Country | Rate | | Country | Rate | Country | Rate |
|---|---|---|---|---|---|---|
| Grenada (Including | | M | Mauritania | $4.37 | Singapore | $2.24 |
|   Carriacou) | $2.30 | | Mauritius | 4.76 | Slovakia | 2.52 |
| Guadeloupe | 2.11 | | Mayotte Island | 5.89 | Slovenia | 2.57 |
| Guantanamo Bay | 2.60 | | Mexico | 1.66 | Solomon Islands | 5.14 |
| Guatemala | 2.47 | | Micronesia | 3.11 | Somalia | 3.87 |
| Guinea | 3.75 | | Moldova | 3.97 | South Africa | 2.44 |
| Guinea Bissau | 6.46 | | Monaco | 1.80 | Spain (Including Balearic | |
| Guyana | 3.19 | | Mongolia | 7.51 |   Islands, Canary Islands, | |
| Haiti | 2.49 | | Montserrat | 2.22 |   Ceuta and Melilla) | 2.21 |
| Honduras | 2.65 | | Morocco | 3.51 | Sri Lanka | $4.65 |
| Hong Kong | 2.49 | | Mozambique | 5.08 | St. Helena | 4.55 |
| Hungary | 2.35 | | Myanmar | 8.36 | St. Kitts | 2.20 |
| Iceland | 2.26 | | Namibia | 2.75 | St. Lucia | 2.21 |
| India | 3.71 | | Nauru | 5.28 | St. Pierre/Miquelon | 1.80 |
| Indonesia | 3.03 | | Nepal | 4.46 | St. Vincent/Grenadines | 2.29 |
| Iran | 3.56 | | Netherlands | 1.78 | Sudan | 5.57 |
| Iraq | 4.33 | | Netherlands Antilles | 2.05 | Suriname | 3.89 |
| Ireland | 1.83 | | Nevis | 2.20 | Swaziland | 2.71 |
| Israel | 2.67 | | New Caledonia | 3.00 | Sweden | 1.78 |
| Italy | 2.07 | | New Zealand | 2.65 | Switzerland | 1.89 |
| Ivory Coast | 3.67 | M | Nicaragua | 2.58 | Syria | 4.76 |
| Jamaica | 2.24 | | Niger | 3.75 | Taiwan | 2.67 |
| Japan | 2.00 | | Nigeria | 2.73 | Tajikistan | 3.46 |
| Jordan | 2.66 | | Niue Island | 6.82 | Tanzania | 3.06 |
| Kazakhstan | 3.46 | | Norfolk Island | 6.33 | Thailand | 2.72 |
| Kenya | 3.07 | | Norway | 1.82 | Togo | 3.14 |
| Kiribati | 4.71 | | Oman | 2.84 | Tonga | 4.24 |
| Korea, Democratic | | | Pakistan | 5.59 | Trinidad/Tobago | 2.27 |
|   People's Republic of | 7.37 | | Palau | 5.10 | Tunisia | 2.82 |
| Korea, Republic of | 2.49 | | Palestine | 2.67 | Turkey | 2.52 |
| Kuwait | 2.68 | | Panama | 2.45 | Turkmenistan | 3.46 |
| Kyrgyzstan | 3.45 | | Papua New Guinea | 3.02 | Turks and Caicos Islands | 2.13 |
| Laos | 7.92 | | Paraguay | 3.04 | Tuvalu | 7.96 |
| Latvia | 4.08 | | Peru | 2.73 | Uganda | 3.04 |
| Lebanon | 4.29 | | Philippines | 2.96 | Ukraine | 3.46 |
| Lesotho | 2.61 | | Pitcairn Island | 2.65 | United Arab Emirates | 2.37 |
| Liberia | 2.72 | | Poland | 2.21 | United Kingdom | 1.50 |
| Libya | 2.91 | | Portugal (Including Azores | | Uruguay | 2.63 |
| Liechtenstein | 1.89 | |   and Madeira Islands) | 2.23 | Uzbekistan | 3.46 |
| Lithuania | 3.62 | | Qatar | 2.83 | Vanuatu | 6.41 |
| Luxembourg | 1.90 | | Reunion Island | 4.70 | Vatican City | 2.07 |
| Macao | 3.53 | | Romania | 3.14 | Venezuela | 1.87 |
| Macedonia | 2.45 | | Russia | 3.46 | Vietnam | 4.04 |
| Madagascar | 6.96 | | Rwanda | 5.00 | Wallis and Futuna | 6.29 |
| Malawi | 2.56 | | San Marino | 1.91 | Western Sahara | 2.21 |
| Malaysia | 2.74 | | Sao Tome | 6.61 | Western Samoa | 4.64 |
| Maldives | 4.65 | | Saudi Arabia | 2.93 | Yemen, Republic of | 2.78 |
| Mali Republic | 4.58 | | Senegal | 3.94 | Yugoslavia | 2.65 |
| Malta | 3.05 | | Seychelles Islands | 4.99 | Zaire | 2.73 |
| Marshall Islands | 3.12 | | Sierra Leone | 4.12 | Zambia | 2.33 |
| | | | | | Zimbabwe | 2.62 |

CERTAIN MATERIAL LOCATED ON THIS PAGE WAS FORMERLY FOUND ON 3RD REVISED PAGE NO. 736.

Issued: May 11 2000

Effective: May 12, 2000

Issued by:   Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C.  20006