*19*

United States District Court
Southern District of Texas
FILED

NOV 0 6 2000

Michael N. Milby
Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MARIA McKENZIE, on behalf of herself and all others similarly situated, | § § § | CIVIL ACTION NO. B-00-148 JURY |
| Plaintiffs, | § § | |
| v. | § § | |
| WORLDCOM, INC. a/k/a MCI WORLDCOM, INC. a/k/a MCI WORLDCOM COMMUNICATIONS, INC., | § § § § | |
| Defendant. | § § | |

## MCI WORLDCOM COMMUNICATIONS, INC.'S
## OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

Defendant MCI WORLDCOM Communications, Inc. ("WorldCom") opposes the Motion for Remand (the "Motion") filed by Plaintiff Maria McKenzie ("Plaintiff"), on behalf of herself and all others similarly situated.

## INTRODUCTION

Plaintiff originally filed this case in Cameron County District Court. WorldCom removed the case to this Court, asserting that all of plaintiff's claims were completely preempted by the Communications Act of 1934 (the "Act"), 47 U.S.C. § 151, et seq., thereby establishing federal question jurisdiction. In her Motion, plaintiff denies that this Court has federal question jurisdiction over the claims asserted in the petition. Plaintiff contends that the Act does not completely preempt the claims asserted in her petition.

1

None of Plaintiff's arguments has any merit. The allegations in her petition lie at the core of the complete preemption doctrine under the Act. The petition directly challenges the rates charged to Plaintiff for interstate calls -- rates that the Act required WorldCom to set forth in tariffs filed with the Federal Communications Commission ("FCC"). In sum, Plaintiff contends that there is a disparity between the rates, charges and fees conspicuously disclosed in WorldCom's advertisements and solicitations and the rates, charges and fees that she actually pays WorldCom for telecommunications services. Through an award of damages, Plaintiff seeks to be charged a rate different from that set forth in WorldCom's filed tariff. Accordingly, Plaintiff's claims are a thinly veiled attack on WorldCom's federal tariff.

Because federal law comprehensively and exclusively regulates rates for interstate telecommunications services -- indeed, the Act <u>requires</u> WorldCom to charge the rates set forth in its FCC tariffs and <u>specifically prohibits</u> upward or downward deviations, *see* 47 U.S.C. § 203(c) -- numerous courts have held that claims challenging the lawfulness of interstate rates are completely preempted. As one Court of Appeals recently explained, "Congress has decreed that suits related to rates and service of telephone companies be handled in federal court. . . ." *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 984 (7th Cir. 2000). Plaintiff's claims arise, if at all, exclusively under federal law. For these reasons, the Motion should be denied.

## **PLAINTIFF'S CLAIMS**

Plaintiff alleges causes of action for negligent misrepresentation and violation of the Texas Deceptive Trade Practices Act ("DTPA"), claiming that WorldCom made certain misrepresentations and failed to disclose certain rates, fees, charges or restrictions in advertisements and solicitations. Petition, ¶ 10-12. Plaintiff alleges, among other things, that WorldCom:

2

- Failed clearly and conspicuously to disclose in its advertisements and solicitations the "Carrier Access Charge" (Petition, ¶ 37.a); the "Federal Universal Service Fee" (Petition, ¶ 37.b); other monthly fees (Petition, ¶ 37.c); the monthly minimum charge (Petition, ¶ 37.d); and location and time of day restrictions (Petition, ¶ 37.e-f).

- Misrepresented, directly or impliedly, that billing for its long distance services would be included with the consumer's local telephone bill when consumers received two bills (Petition, ¶ 37.j).

- Engaged in deceptive advertising and solicitation practices by cramming unwanted enhanced services onto consumers' phone bills; (Petition, ¶ 37.m).

- Concealed, suppressed and/or omitted by failing clearly and conspicuously to disclose the material fact that there is a surcharge on all calling card calls. (Petition, ¶ 37.t).

Plaintiff asserts that these acts allegedly resulted in her and other Texas consumers incurring charges that exceeded the advertised rate. Petition, ¶ 14. Plaintiff claims she was injured by the difference between what she paid for telecommunication services and what she believed WorldCom represented she would pay. Petition, ¶ 33.

## ARGUMENT

### A.  The Legal Standard for Removal.

Removal is proper from state to federal court where an action could have been brought originally in federal court. 28 U.S.C. § 1441(a). Absent diversity jurisdiction, the action must "arise under the Constitution, laws or treaties of the United States." 28 U.S.C. § 1331. The party removing the action to federal court bears the burden of establishing federal jurisdiction. *Wilson v. Republic Iron & Steel Co.*,

3

257 U.S. 92, 97 (1921); *Winters v. Diamond Shamrock Co.*, 149 F.3d 387, 397 (5th Cir. 1998), *cert. denied,* 119 S.Ct. 1286 (1999).

Under the well-pleaded complaint doctrine, the plaintiff is the "master of the complaint," and a case may not be removed to federal court solely on the basis of the defense of preemption. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392-93 (1987). However, even a well-pleaded complaint may not avoid federal court where Congress intends the preemptive force of a federal statute to be so extraordinary that it "completely preempts" an area of state law. *See id.* This is known as the doctrine of complete preemption. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-65 (1987). The doctrine of complete preemption "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Id.* at 65; *Avco Corp. v. Aero Lodge No. 735*, 390 U.S. 557 (1968).

The Fifth Circuit has explained:

> "Congress may so completely preempt a particular area that any civil complaint raising this select group of claims is necessarily federal in character," and the case may be removed even if no federal claim is asserted in the complaint and federal preemption, raised as a defense, is the only issue of federal law implicated in the case.

*Anderson v. Electronic Data Systems Corp.*, 11 F.3d 1311, 1315 (5th Cir.), *cert. denied*, 513 U.S. 808 (1994) (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 66-67 (1987*)). See also Rivet v. Regions Bank of Louisiana*, 118 S. Ct. 921, 925 (1998); *Heimann v. National Elevator Indus. Pension Fund*, 187 F.3d 493, 500 (5th Cir. 1999). "Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar*, 482 U.S. at 393. "[C]omplete

4

preemption is jurisdictional in nature rather than an affirmative defense to a claim under state law."

*Heimann*, 187 F.3d at 500.

To establish complete preemption in the Fifth Circuit, a defendant must show that:

(1)  the statute contains a civil enforcement provision that creates a cause of action that both replaces and protects the analogous area of state law;

(2)  there is a specific jurisdictional grant to the federal courts for enforcement of the right; and

(3)  there is a clear Congressional intent that claims brought under the federal law be removable.

*Heimann*, 187 F.3d at 500.[1]  Contrary to Plaintiff's conclusory arguments, the Communications Act satisfies each prong of the Fifth Circuit's test and completely preempts the Plaintiff's state law claims.

## B.  The Federal Communications Act and the Filed Tariff Doctrine

To protect consumers, Congress has established a comprehensive federal regulatory scheme to set reasonable rates and prevent discrimination among ratepayers.  This scheme is set forth in the Communications Act of 1934, 47 U.S.C. § 151 et seq. (the "Communications Act").  Under the Communications Act, common carriers such as WorldCom must "file with the [FCC] . . . schedules showing all charges . . . and showing the classifications, practices, and regulations affecting such charges." 47 U.S.C. § 203(a).  The schedules required to be filed under the Communications Act are known as "tariffs."  The filed tariff doctrine prohibits any deviation from what is set forth in the tariff because any intrusion into the regulatory system disrupts its key purpose: to prevent discrimination in rates paid by consumers.

---

[1]  WorldCom need demonstrate that only one of Plaintiff's claims challenges tariffed rates and is therefore completely preempted to establish federal jurisdiction; to the extent any of Plaintiff's state-law claims survive, this Court has supplemental jurisdiction over them.  *See 28 USC §1367(a).*

In *AT&T v. Central Office Telephone*, 118 S.Ct. 1956 (1998), the Supreme Court emphatically reaffirmed the "century old" filed tariff doctrine, which protects the FCC's exclusive authority to regulate interstate and international rates. 118 S. Ct. at 1962. *See also Maislin Indus. U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 126 (1990); *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 582 (1981). As the Court explained in *Central Office,* "the rate of the carrier duly filed [in a tariff] is the only lawful charge . . . . [T]he carrier must abide by it, unless it is found *by the Commission* to be unreasonable." 118 S. Ct. at 1962-63 (emphasis added) (quotation omitted). "[E]ven if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with the published tariff." *Central Office,* 118 S. Ct. at 1963. *Accord Marco Supply Co. v. AT&T,* 875 F.2d 434, 435 (4th Cir. 1989). Indeed, as the Supreme Court made clear, "strict application [of the filed tariff doctrine] is necessary" to protect the basic objectives of the Communications Act. *Id.* at 1963.

Pursuant to these statutory and regulatory requirements, WorldCom has filed with the FCC its Tariffs, which contain the schedules listing rates charged for WorldCom's interstate and international customers. The pertinent provisions of WorldCom's Tariff F.C.C. No. 1 are attached hereto as Exhibit A.[2] The rates, fees, charges and restrictions Plaintiff attacks in her Petition are set forth in the Tariff.

A carrier cannot "charge, demand, collect or receive a greater or less or different compensation for . . . communication, or for any service in connection therewith . . . than the charges specified in the

---

[2]   These tariffs are public documents. It is well established that a Court may take judicial notice of tariffs. *See, e.g., Carter v. AT&T Co.,* 365 F.2d 486, 491-91 & n.7 (5th Cir. 1966) (district court authorized to take judicial notice of tariff filings); *Marcus v. AT&T Corp.,* 938 F. Supp. 1158, 1164-65 (S.D.N.Y. 1996), *aff'd,* 138 F.3d 46 (2d Cir. 1998) (taking judicial notice of tariffs filed with the FCC for purposes of a motion to dismiss); *see also Mack v. South Bay Beer Distrib. Inc.,* 798 F.2d 1279, 1282 (9th Cir. 1986); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir. 1991).

[tariff] then in effect." 47 U.S.C. § 203(c). *See Central Office*, 118 S. Ct. at 1962; *MCI Telecommunications Corp. v. American Tel. & Tel. Co*, 512 U.S. 218, 230 (1994). Furthermore, "[n]o carrier . . . shall . . . extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule." *See* 47 U.S.C. § 203(c). Once a tariff is filed with the FCC, it attains the status of binding federal law. *See, e.g., Lowden v. Simonds-Shields-Lonsdale Grain Co.*, 306 U.S. 516, 520 (1939) ("Until changed, tariffs bind both carriers and [customers] with the force of law."); *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 163 (1922) ("Unless and until suspended or set aside, [the tariff] rate is made, for all purposes, the legal rate . . . ."). Making the tariff federal law has the effect of binding common carriers to a national set of rates and services so that consumers are protected from discrimination. The FCC is provided with oversight and enforcement powers with respect to common carriers to ensure that their rates, services and practices are reasonable and uniform.

## C. The Communications Act Satisfies the Fifth Circuit's Complete Preemption Test

The Communications Act satisfies all three prongs of the Fifth Circuit's test for complete preemption. It contains a civil enforcement provision that creates a cause of action replacing and protecting analogous areas of state law. The Act confers jurisdiction on the federal courts to enforce the statutory right. Finally, there is clear legislative intent that claims under the Act are removable.

### 1. The Communications Act Contains a Civil Enforcement Provision

The Communications Act contains a civil enforcement provision that replaces the very type of state law claims concerning telecommunications services that Plaintiff asserts here. The Communications Act requires that "[a]ll charges, practices, classifications, and regulations for and in connection with such

7

communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful . . . ." 47 U.S.C. § 201(b).  The Communications Act specifies the remedies available for a violation of the Act.  Section 206 provides that "[i]n case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, . . . such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation . . . ." 47 U.S.C. § 206.

A person injured by a carrier's violation under Section 206 may enforce the Act through civil litigation.  Any person claiming to be damaged may make a complaint to the FCC or "may bring suit . . . in any district court of the United States of competent jurisdiction." 47 U.S.C. § 207. These provisions clearly create a civil action and provide a remedy for persons aggrieved by providers of interstate telecommunications services. Thus, because Congress set out a civil enforcement provision for violations of the Communications Act the first prong of the Fifth Circuit's standard is satisfied. *See, e.g. Brown v. Crop Hail Management, Inc.*, 813 F. Supp. 519, 526 (S.D. Tex. 1993)(finding civil action created for under Federal Crop Insurance Act replaces Plaintiff's state law claims and adequately protects the interest at heart of those claims).

    **2.**      **Jurisdictional Grant.**

Congress has also granted jurisdiction to the federal courts. *See Heimann,* 187 F.3d at 501. Section 401 of the Communications Act provides "[t]he district courts of the United States shall have jurisdiction . . . alleging a failure to comply with or a violation of any of the provisions of this chapter by any

person . . ." 47 U.S.C. 401(a).  The Communications Act therefore satisfies the second prong of the Fifth Circuit test for complete preemption.

### 3.   Congress Clearly Intended for Plaintiff's Claims be Removable.

Clear intent may be shown through the Congressional creation of a parallel cause of action. *McClelland v. Gronwaldt*, 155 F.3d 507, 517 (5th Cir. 1998).  In the Communications Act, Congress created a civil action to challenge a carrier's rates, services and practices.  The Communications Act also provides for the recovery of damages and a right to equitable relief.  47 U.S.C. § 206-07.  "Congress has expressed the necessary intent to confer removal jurisdiction through complete preemption by creating a parallel federal cause of action via Section 207 of the FCA that would 'convert' a state-law cause of action into a federal cause of action for purposes of the well-pleaded complaint rule." *Hunt v. Prison Realty Trust, Inc.*, No. 3:00-0244, *slip opinion* (M.D. Tenn. August 28, 2000) (holding plaintiff's state law consumer fraud and breach of contract claims completely preempted and subject to removal).[3]

The Communications Act's purpose of protecting consumers by providing a mechanism to ensure reasonable, nondiscriminatory rates further illustrates the intent of Congress . "Congress has expressed the necessary intent to confer removal jurisdiction to determine the validity of tariffs is clear in light of the FCA's incorporation of the filed tariff doctrine." *Hunt* at 10.  The tariff system has the effect of binding common carriers to a national set of rates and services so that consumers are protected from discrimination and the FCC is provided with oversight and enforcement powers with respect to common carriers to ensure that their rates, services and practices are reasonable.  This regulatory scheme is exclusive, because any intrusion obliterates the uniform purpose.

---

[3]  A copy of the opinion in *Hunt v. Prison Realty Trust, Inc.* is attached to this opposition as Exhibit B.

9

**D.    The Communication Act Preempts Plaintiff's Claims**

Federal courts have repeatedly found federal jurisdiction under the complete preemption doctrine with respect to state-law claims challenging the legality of rates and practices tariffed with the FCC. *See, e.g., Bastien v. AT&T Wireless Servs. Inc.*, 205 F.3d 983 (7th Cir. 2000) (upholding removal in case asserting state-law breach of contract and consumer fraud claims); *Cahnmann v. Sprint Corp.*, 133 F.3d 484 (7th Cir.) (upholding removal in case asserting state-law breach of contract and fraud claims), *cert. denied,* 524 U.S. 952 (1998); *Marcus v. AT&T Corp.,* 138 F.3d 46, 55-56 (2d Cir. 1998) (upholding removal in case asserting, *inter alia,* state-law breach of warranty claim); *World Access USA Corp. v. AT&T Corp.,* 2000 WL 297845 (S.D. Fla. 2000) (upholding removal in case asserting state-law breach of contract); *Mellman v. Sprint Communications Co.,* 975 F. Supp. 1458 (N.D. Fla. 1996) (upholding removal in case asserting state-law breach of contract claim); *In re Comcast Cellular Telecomms. Litig.,* 949 F. Supp. 1193 (E.D. Pa. 1996) (upholding removal in case asserting state-law breach of implied duty of good faith and fair dealing and unjust enrichment claims); *Thermalcraft, Inc. v. U.S. Sprint Communications Co.,* 779 F. Supp. 1039 (W.D. Mo. 1991) (upholding removal in case asserting state-law breach of contract and tort claims).

In this instance, Plaintiff essentially alleges Worldcom misrepresented the amount she would be charged and seeks actual damages in the form of the difference between what she paid for telephone services from WorldCom and what she believed WorldCom represented she would be charged. The filed tariff doctrine undoubtedly preempts Plaintiff's claim under such alleged circumstances. As recently held by a Massachusetts federal district court, "[e]ven if the carrier fraudulently misrepresents its rates and the customer relies on the misrepresentation, the carrier cannot be held to the promised rate if it conflicts with

10

the published tariff." *Kline & Co. v. MCI Communications Corp.*, 98 F.Supp.2d 69, 71 (D. Mass. 2000). Therefore, even if WorldCom misrepresented its rates and charges, Plaintiff's claims nevertheless are subject to the filed tariff doctrine.

*Cahnmann* and *Marcus* further demonstrate this point. In *Cahnmann,* plaintiffs complained that, four months after they signed up for a Sprint program offering one year of free calls on Fridays, Sprint amended its tariff to exclude calls to ten foreign countries from the program. 133 F.3d at 486. Bringing a class action in state court, plaintiffs asserted state-law claims for breach of contract and fraud. *Id.* After removal, the Seventh Circuit affirmed the preemption of plaintiffs' state-law claims, finding that even if Sprint had planned "from the start to renege on the offer of a full year of free Friday calls," plaintiffs' state law contract and fraud claims would still be barred because "[o]nce a tariff is filed and until it is amended, modified, superseded, or disapproved, the carrier may not deviate from its terms." *Id.* at 486-87. More importantly for present purposes, the Seventh Circuit also found federal jurisdiction, concluding that the state-law claims had been completely preempted. Any suit to invalidate the provisions of a federal tariff by definition "arise[s] under federal law," the court concluded. *Id.* at 488. As the court found, "[f]ederal law does not merely create a right; it occupies the whole field, displacing state law." *Id.* at 489. "If a claim can arise only under federal law, because federal law has extinguished the state law basis under which it might otherwise arise, the case is removable to federal court even if the plaintiff sedulously avoids mention of federal law in his complaint."[4] *Id.* at 490.

---

[4] *Cahnmann* recognized that claims not involving a challenge to rates or other provisions in an FCC tariff might not be completely preempted. 133 F.3d at 488. But that court subsequently re-affirmed that complaints (such as those here) "involv[ing] rates . . . [are] specially reserved to federal control." *Bastien*, 205 F.3d at 987.

*Marcus* is similar. In that case, plaintiffs filed in state court various state-law claims (both statutory and common law) challenging AT&T's failure to disclose its practice of rounding the length of long-distance calls to the next higher full minute. 138 F.3d at 51. After removal, the Second Circuit affirmed the district court's finding that the plaintiffs' breach of warranty claim was completely preempted by the Act, thereby establishing federal jurisdiction. *Id.* at 55-56. As the court explained, "'[t]he legal relationship between AT&T and its customers is defined by the tariffs, which consist of the terms and conditions of the common carrier's service and rates, that AT&T is required to file and maintain with the' FCC under the FEA." *Id.* at 56 (quoting *American Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 552 (2d Cir. 1996)). Because "[t]he 'tariffs conclusively and exclusively enumerate the rights and liabilities of the contracting parties,'" the Second Circuit concluded that the plaintiffs' "breach of warranty claim necessarily raises a substantial federal question over which federal courts may properly exercise jurisdiction."[5] *Id.*

Plaintiff may argue she is not challenging or seeking to alter the filed tariff, but she unquestionably is doing just that. Plaintiff seeks to recoup the difference between what she alleges WorldCom represented she would pay for long distance telephone services and what WorldCom's tariff actually dictates. Plaintiff in effect seeks a rebate. The filed tariff doctrine not only prohibits courts from altering filed rates directly, it also forbids courts from awarding any relief that would result in customers effectively being charged a rate different from the tariffed rate. *See Marcus*, 138 F.3d at 61; *Kutner v. Sprint Communications Co.*, 971 F.Supp. 302, 306 (W.D. Tenn. 1997) Any recovery of damages is barred because it would enable the customer, in effect, to receive telecommunications services at a rate lower than the rate available to

---

[5] With respect to other claims, the court rejected AT&T's complete preemption argument. But the Second Circuit found complete preemption as to the warranty claim and, in fact, explicitly stated its agreement with *Cahnmann*'s conclusion that the rate claim at issue in that case was completely preempted. *Marcus*, 138 F.3d at 55.

12

similarly situated consumers. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 578-79 (1981);

*Marcus*, 138 F.3d at 60. *See also Kline* 98 F.Supp.2d at 71 ("As a corollary, the [filed tariff] doctrine

proscribes the court from rendering any relief that effectively would enforce a "charge" between the carrier

and the customer not contained in the carrier's filed tariff."). In *Hunt*, the district court also recognized the

filed tariff doctrine's prohibition against awarding damages that in effect rebate a portion of the rates and

charges set forth in a filed tariff. In refusing to do so, the court noted it "would be essentially reimbursing

Plaintiff for a portion of the FCC-approved rate which she paid to the phone company." *Hunt* at p.13.

Plaintiff's attempt to recoup a portion of what she paid to WorldCom thus is barred by the filed tariff

doctrine.

The arguments advanced by plaintiff in the Motion do not lead to a different result. Choosing to

ignore the cases WorldCom cited in its Notice of Removal as supporting complete preemption under the

Act, *see* Notice of Removal at 7-9, plaintiff relies heavily on the savings clause in the Communications Act.

The savings clause provides: "Nothing in this chapter contained shall in any way abridge or alter the

remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such

remedies." 47 U.S.C. § 414. However, Plaintiff's broad reading of section 414 was specifically rejected

by the Supreme Court in *Central Office*. In that case, plaintiff sued AT&T for state-law breach of

contract and tortious interference with contract, alleging that AT&T failed to provide various services in

addition to those set forth in its FCC tariff. The Court held that the filed rate doctrine barred the state-law

claims. In so holding, the Court rejected the argument that the savings clause preserved state-law claims

such as those at issue here. As the Court explained:

> Section 414 copies the savings clause of the [Interstate Commerce Act],
> and we have long held that the latter preserves only those rights that are

13

> not inconsistent with the statutory filed-tariff requirements. A claim for
> services that constitute unlawful preferences or that directly conflict with
> the tariff . . . cannot be 'saved' under § 414. 'The [savings] clause . . .
> cannot in reason be construed as continuing in [customers] a common law
> right, the continued existence of which  would be absolutely inconsistent
> with the provisions of the act. In other words, the act cannot be held to
> destroy itself.'[6]

524 U.S. at 227-28 (quoting *Texas & P. Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446 (1907))

(second omission and brackets in the original) (citations omitted). *See also United States v. Locke*,

529 U.S. 89, 120 S. Ct. 1135, 1147 (2000) ("We decline to give broad effect to savings clauses where

doing so would upset the careful regulatory scheme established by federal law." (citing *Central Office*).

Just as in *Central Office*, plaintiff's claim for a rate different from that set forth in the FCC tariff "cannot

be 'saved' under § 414." *Id.*

　　　Plaintiff contends that WorldCom's complete preemption argument is defeated by "relevant" cases

from the Supreme Court, the Fifth Circuit, and Texas federal courts. Inexplicably, Plaintiff first relies on

*Central Office*, which, as discussed above, supports WorldCom's position and directly contradicts

Plaintiff's reliance on the savings clause in Section 414. Plaintiff also mistakenly refers to two law review

articles that suggest the Act's savings clause preserves state law causes of action. Yet these two articles,

written in 1992 and 1996, are directly contradicted on this point by the Supreme Court's 1998 decision

---

[6] In *Cahnmann*, the Seventh Circuit anticipated *Central Office's* discussion:

> Although the [savings clause] is broadly written, if it were interpreted literally as
> permitting a state-law breach of contract suit regarding a tariffed service it would
> impair the Act's policy of confining telecommunications common carriers to tariffed
> services and vesting the FCC with primary jurisdiction to determine the validity of
> tariffs; indeed, it would effectively nullify the tariff provisions of the
> Communications Act. Such interpretations of savings clauses in common carrier
> statutes -- interpretations that would empower state courts to gut the federal
> regulatory scheme or would place the carrier under inconsistent obligations -- are
> therefore rejected.

133 F.3d at 488.

14

in *Central Office*. These articles also either ignore or pre-date the numerous cases cited herein where state law causes of action were found to be completely preempted.[7]

*Access Telecom, Inc. v. MCI Telcomms, Corp.*, 197 F.3d 694 (5th Cir. 1999), which is cited for a proposition for which it does not stand, also does not support Plaintiffs' position. At issue in *Access* was the doctrine of ordinary preemption.[8] The Fifth Circuit did not address whether the case was properly removed to federal court and whether the doctrine of complete preemption applies to the Communications Act or to the Filed Tariff Doctrine. Instead, the Court considered whether MCI's filed tariff preempted the Plaintiff's tortious interference claims. In holding that the filed tariff doctrine did not preempt the Plaintiff's tortious interference claims, the Court was only speaking to whether these claims fell within the scope of the filed tariff doctrine and not whether claims falling within the filed tariff doctrine are completely preempted. When addressing the tortious interference claim, the Court stated:

> It does not concern the provision of services which are covered by the filed tariff, but rather it concerns illegal actions outside the scope of the tariff and not derivative of any phone services. Therefore, the filed rate doctrine does not preempt ATI's tortious interference claims.

---

[7] *See supra* at pp. 10-13.

[8] Plaintiff's reliance on *Access* confuses two separate concepts of preemption -- the jurisdictional doctrine of "complete preemption" and the federal defense of preemption, also known as "ordinary preemption". The Eleventh Circuit Court of Appeals has explained the difference as follows:

> The inclusion of the term "preemption" within the doctrine's label, while not inaccurate, has enkindled a substantial amount of confusion between the complete preemption doctrine and the broader and more familiar doctrine of ordinary preemption. Stated simply, complete preemption functions as a narrowly drawn means of assessing federal removal jurisdiction, while ordinary preemption operates to dismiss state claims on the merits and may be invoked in either federal or state court.

*BLAB T.V. of Mobile, Inc. v. Comcast Cable Communications, Inc.*, 182 F.3d 851, 854-55 (11th Cir. 1999). In other words, complete preemption is grounds for removal to federal court while ordinary preemption, albeit a defense to a plaintiff's state law claims, is not a sufficient basis for removal jurisdiction.

*Id.* at 711.[9] In contrast, the Plaintiff here attack rates, fees and practices that fall squarely within the scope of WorldCom's tariff, and her claims are completely preempted by the Communications Act.

*MCI Telecomms. Corp. v. Credit Builders of Am. Inc.,* 980 F.2d 1021 (5th Cir.), *cert. granted and judgment vacated,* 508 U.S. 957, *opinion reinstated,* 2 F.3d 103 (5th Cir.), *cert. denied,* 510 U.S. 978 (1993), is not to the contrary. First, *Credit Builders* is not good law. As a district court within this Circuit concluded, the *Credit Builders* panel impermissibly failed to follow a prior Fifth Circuit case, *American Tel. & Tel. Co. v. Florida-Texas Freight, Inc.,* 357 F. Supp. 977 (S.D. Fla.), *aff'd per curiam,* 485 F.2d 1390 (5th Cir. 1973), and therefore is not binding precedent. *See MCI Telecomms. Corp. v. United Showcase, Inc.,* 847 F. Supp. 510, 511-13 (N.D. Tex. 1994). In *Florida-Texas Freight,* which is binding precedent, the district court -- in an opinion expressly adopted by the Fifth Circuit -- concluded that the federal courts have federal question jurisdiction under the Act over actions to collect unpaid long-distance charges. 357 F. Supp. at 978. *See also* 485 F.2d at 1390 (affirming "[f]or reasons cogently expressed in the district court opinion").[10]

In any event, *Credit Builders* is inapposite. In that case, MCI filed an ordinary collection action against a customer for unpaid long-distance charges in federal court, asserting that federal common law preempted state contract law in such circumstances. 980 F.2d at 1021-22. The Fifth Circuit rejected this asserted basis for jurisdiction and dismissed the action. The Court of Appeals stated:

---

[9] In *Access,* the plaintiff was not challenging the rates charged by MCI. Instead, the plaintiff was a long distance carrier who asserted a tortious interference claim against MCI for MCI's alleged release of Access Telecom's confidential information to Teléfonos de México and AT&T.

[10] The reference to *Credit Builders* in *Frank v. Bear Stearnes & Co.,* 128 F.3d 919, 923 (5th Cir. 1997), for a point other than the holding of the case does not mean that the holding of *Credit Builders* remains viable. Furthermore, other circuits have declined to follow *Credit Builders. See, e.g., AT&T v. City of New York,* 83 F.3rd 549, 552 (2nd Cir. 1996); *Western Union Int'l, Inc. v. Data Dev., Inc.,* 41 F.3d 1494 (11th Cir. 1995); *MCI Telecommunications Corp. v. Graham,* 7 F.3d 477 (6th Cir. 1993).

16

> This case involves MCI's ability to recover on a contract or its ability to recover in quantum merit. It does not involve the validity, construction, or effect of the Communications Act or any other federal statute.

*Id.* at 1023.

Unlike *Credit Builders*, federal jurisdiction here is based on preemption by federal statute and regulation. Plaintiff seeks to enforce rates and terms that are different than those contained in WorldCom's filed tariff. MCI's tariff is binding federal law. *See Lowden*, 306 U.S. at 520. In contrast to the ordinary collection action at issue in *Credit Builders*, Plaintiff's claims in this case are a direct attack on WorldCom's tariff.

The two cases from the Northern District of Texas cited by the Plaintiff do not weigh against complete preemption of the Plaintiff's claims. Neither case addressed whether the Communication Act completely preempts the kind of claims asserted by the Plaintiff in this case. In *Statton Holdings, Inc. v. MCI WorldCom Communs., Inc.*, 2000 U.S. Dist. Lexis 8939, No. 3: 99-CV-2876-D (Northern District of Texas, June 26, 2000), plaintiff originally filed suit for negligence, gross negligence and willful misconduct arising out of service interruptions. The Court granted MCI's motion to dismiss the case on the grounds that the Plaintiff's state-law claims were preempted by the Communications Act and the filed tariff doctrine. However, the Court "permitted Statton to amend its complaint to allege claims under the FCA, consistent with the Filed-Tariff Doctrine." *Id.* After Statton amended its complaint, the Court granted MCI's new motion to dismiss as to negligence and gross negligence claims, but did not dismiss the claim for willful misconduct. The Court allowed that claim to continue because MCI's tariff stated that "MCI's liability for willful misconduct ... is not limited by this tariff." *Id.* The Court did not address whether claims inconsistent with the tariff are completely preempted by the Communications Act and the Filed Tariff Doctrine.

17

*Drew v. MCI WorldCom Management Co.*, 1999 U.S. Dist. Lexis 18677, No. 3: 99-CV-1355-D (Northern District of Texas, December 1, 1999), also is of no help to the Plaintiff. Even though the case had been removed to federal court, *Drew* did not involve a motion to remand to state court or the issue of complete preemption. In *Drew,* the Plaintiff contends that MCI has charged him an amount as a Federal Universal Service Fee ('FUSF"), which is greater than the Federal Universal Service Fee set forth in MCI's tariff. On MCI's Motion to Dismiss, the District Court ruled that the Filed Tariff Doctrine does not preclude the plaintiff's claim because he allegedly is not attacking the fees set out in the tariff, but rather seeking to enforce the tariff. The court did not address whether a claim attacking the FUSF provisions of the tariff, which is one of the claims Plaintiff asserts here, is subject to complete preemption.[11]

Finally, the Plaintiff relies on *Esquivel v. S.W. Bell Mobile Sys.*, 920 F.Supp. 713 (S. D. Tex. 1996). Contrary to Plaintiff's argument, *Esquivel* is not on point. *Esquivel* was a class action by cellular telephone customers who contended the liquidated damage provision of their service agreements that governed early customer termination of service was punitive and invalid under Texas law. The Court concluded that the liquidated damages was not covered by the tariff and had not been passed on by the FCC. The district court stated:

> The Court is persuaded that the liquidated damage provision here is a "term and condition" of the agreement rather than a rate. Defendant's Tariff Rate Plan contains no reference to the amount of liquidated damages sought to be imposed in the event of early cancellation.

*Id.* at 715. The court then concluded, "[n]othing in the Tariff filed by Defendant indicates that the FCC has ever passed upon the amount of liquidated damages specified in Defendant's agreements." *Id.*

---

[11] MCI recently filed a Renewed Motion to Dismiss in the *Drew* case based on the Filed Tariff Doctrine with the approval of the District Court.

18

Here, in contrast, the Plaintiff attacks rates specifically set forth in WorldCom's tariff, and seeks relief that is inconsistent with the terms of the tariff. Furthermore, this Court now has the benefit of *Central Office* which post-dates the 1996 decision in *Esquivel* and specifically rejects the notion that the "savings clause" of the Communications Act defeats preemption.

## **CONCLUSION**

By her claims, the Plaintiff is attempting to alter rates, fees, charges and restrictions set forth in WorldCom's federal tariff. She is not attempting to enforce the tariff – she is attempting to modify the tariff for herself and others in Texas. The Communications Act provides more than a defense to such claims – it completely subsumes them and turns them into federal claims that can properly be removed to this Court. For these reasons, the Motion to Remand should be denied.

Dallas3 639531 v 4, 46943.00103

Respectfully submitted,

John C. Eichman
Attorney-in-Charge
State Bar No. 06494800
Kerry C. Ahern
State Bar No. 24012195
JENKENS & GILCHRIST
*A Professional Corporation*
1445 Ross Avenue, Suite 3200
Dallas, Texas  75202
Telephone:      (214) 855-4500
Facsimile:      (214) 855-4300

John Alex Huddleston
Texas Bar No. 10148400
JENKENS & GILCHRIST
*A Professional Corporation*
1800 Frost Bank Tower
100 West Houston Street
San Antonio, Texas 78205
Telephone:      (210) 246-5000
Facsimile:      (210) 246-5999

**ATTORNEYS FOR DEFENDANT MCI
WORLDCOM   COMMUNICATIONS,
INC.**

OF COUNSEL:
Thomas F. O'Neil III
William E. Smith
WORLDCOM, INC.
Law and Public Policy
1133 19th Street, N.W.
Washington, D.C. 20036
Telephone:      (202)736-6612
Facsimile:      (202) 736-6482

20

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was served upon the following counsel of record by first class mail, on this 4th day of November, 2000:

Richard C. Jaramillo
Ray L. Vela
Law Offices of Richard Jaramillo &
Associates, P.C.
1412 Main Street, 22nd Floor
Dallas, Texas 75202
(214) 744-3364
(214) 748-6603 - fax

John C. Cuchman

21

MCI TELECOMMUNICATIONS CORPORATION

TARIFF F.C.C. NO. 1
2ND REVISED PAGE NO. 19.1.3.1.1.4.7
CANCELS 1ST REVISED PAGE NO. 19.1.3.1.1.4.7

CUSTOMIZED BUSINESS COMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTIONS AND RATES

3.      METERED USE SERVICE (Cont.)

    .02      Option A (Execunet) (Cont.)

        .025      Premier Calling Plans (Cont.)

            .02521    MCI One Savings Plan II

A variation of Option A (Execunet), MCI One Savings Plan II offers calling within the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Guam and CNMI.

A $5.00 per-account per-month minimum charge will apply if a customer's total MCI One Savings Plan II usage charges are less than $5.00 per account per month. The $5.00 charge is applied against MCI One Savings Plan II usage in the month it is charged.

For all MCI One Savings Plan II Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI, customers will be charged the following, per-minute rates based on rate period:

| Rate Period | Per-Minute Rate |
|---|---|
| Peak | $0.25 |
| Off-Peak | 0.10 |
| Saturday | 0.10 |
| Sunday | 0.05 |

The following Time of Day rate periods apply for domestic MCI One Savings Plan II Dial "1" usage: the Peak rate period applies from 7:00 a.m. to 6:59 p.m. Monday through Friday; the Off-Peak rate period applies from 7:00 p.m. to 6:59 a.m. Monday through Friday; the Saturday rate period applies to all day Saturday; and the Sunday rate period applies to all day Sunday.

Customers will be charged $0.40 per minute for all Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), and Metered Use Service Option T (Feature Card Service) calls which originate in the U.S. Mainland, Alaska, Hawaii and the U.S. Virgin Islands and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI. In addition, for the customer's Option B, Option D, and Option T calls which terminate to a customer's billed ANI, the customer will be charged $0.25 per-minute for calls made between 7:00 a.m. to 6:59 p.m. Monday through Friday; $0.10 per-minute for calls made between 7:00 p.m. to 6:59 a.m. Monday through Friday and all day Saturday; and $0.05 per-minute for calls made all day Sunday. Calling card access surcharges will not apply.

The charges set forth in Section C-3.07337 will apply for calls for Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the international locations set forth in Section C-3.07337. Customers enrolled in this plan are eligible to subscribe to the Option A International Savings Plan 2 described in Section C-3.02512.3.

The subscriber will be automatically enrolled in Personal 800 Plan A, Option 3, as described in Section C-3.02122. The one-time installation fee and monthly subscription fee will be waived.

N
I
N

ISSUED: February 12, 1998

ISSUED BY:      James E. Kerr
                Manager, Federal Tariffs
                1801 Pennsylvania Avenue, N.W.
                Washington, D.C.  20006

EFFECTIVE: February 13, 1998

MCI TELECOMMUNICATIONS CORPORATION

CUSTOMIZED BUSINESS COMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTIONS AND RATES

3.  METERED USE SERVICE (Cont.)

.02  Option A (Execunet) (Cont.)

.025  Premier Calling Plans (Cont.)

.02521  MCI One Savings Plan II

A variation of Option A (Execunet), MCI One Savings Plan II offers calling within the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Guam and CNMI.

A $5.00 per-account per-month minimum charge will apply if a customer's total MCI One Savings Plan II usage charges are less than $5.00 per account per month. The $5.00 charge is applied against MCI One Savings Plan II usage in the month t is charged.

For all MCI One Savings Plan II Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI, customers will be charged the following per-minute rates based on rate period:

| Rate Period | Per-Minute Rate |
|-------------|-----------------|
| Peak | $0.25 |
| Off-Peak | 0.10 |
| Saturday | 0.10 |
| Sunday | 0.05 |

The following Time of Day rate periods apply for domestic MCI One Savings Plan II Dial "1" usage: the Peak rate period applies from 7:00 a.m. to 8:59 p.m. Monday through Friday; the Off-Peak rate period applies from 7:00 p.m. to 6:59 a.m. Monday through Friday; the Saturday rate period applies to all day Saturday; and the Sunday rate period applies to all day Sunday.

Customers will be charged $0.45 per minute for all Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), and Metered Use Service Option T (Feature Card Services) calls which originate in the U.S. Mainland, Alaska, Hawaii and the U.S. Virgin Islands and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI. In addition, for the customer's Option B, Option D, and Option T calls which terminate to a customer's billed ANI, the customer will be charged $0.25 per-minute for calls made between 7:00 a.m. to 6:59 p.m. Monday through Friday; $0.10 per-minute for calls made between 7:00 p.m. to 6:59 a.m. Monday through Friday and all day Saturday; and $0.05 per-minute for calls made all day Sunday. Calling card access surcharges will not apply.

The charges set forth in Section C-3.07337 will apply for calls for Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the international locations set forth in Section C-3.07337. Customers enrolled in this plan are eligible to subscribe to the Option A International Savings Plan 2 described in Section C-3.026.13.

The subscriber will be automatically enrolled in Personal 800 Plan R, Option 3, as described in Section C-3.02122. The one-time installation fee and monthly subscription fee will be waived.

ISSUED: April 30, 1998

ISSUED BY:  James E. Kerr
Manager, Federal Tariffs
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

EFFECTIVE: May 1, 1998

Case 1:00-cv-00148   Document 19   Filed in TXSD on 11/06/2000   Page 24 of 50

MCI TELECOMMUNICATIONS CORPORATION

## CUSTOMIZED BUSINESS COMMUNICATIONS SERVICE

### SECTION C - SERVICE DESCRIPTIONS AND RATES

3.    METERED USE SERVICE (Cont.)

   .02    Option A (Execunet) (Cont.)

      .025    Premier Calling Plans (Cont.)

         .02521    MCI One Savings Plan II: A variation of Option A (Execunet), MCI One Savings Plan II offers calling within the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Guam and CNMI.

A $5.00 per-account per-month minimum charge will apply if a customer's total MCI One Savings Plan II usage charges are less than $5.00 per account per month. The $5.00 charge is applied against MCI One Savings Plan II usage in the month it is charged.

For all MCI One Savings Plan II Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the U.S. Mainland, Alaska, Hawaii, Puerto Rico, the U.S. Virgin Islands, Guam and CNMI, customers will be charged the following per minute rates based on rate period:

| Rate Period | Per-Minute Rate |
|---|---|
| Peak | $0.25 |
| Off-Peak | 0.10 |
| Saturday | 0.10 |
| Sunday | 0.05 |

The following Time of Day rate periods apply for domestic MCI One Savings Plan II Dial "1" usage: the Peak rate period applies from 7:00 a.m. to 6:59 p.m. Monday through Friday; the Off-Peak rate period applies from 7:00 p.m. to 6:59 a.m. Monday through Friday; the Saturday rate period applies to all day Saturday; and the Sunday rate period applies to all day Sunday.

Customers who subscribe to MCI One Savings Plan II will be automatically enrolled in Calling Card Option 1, as described in Section C-3.02525.

The charges set forth in Section C-3.07337 will apply for calls for Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the international locations set forth in Section C-3.07337. Customers enrolled in this plan are eligible to subscribe to the Option A International Savings Plan 2, as described in Section C-3.01523.

The subscriber will be automatically enrolled in Personal 800 Plan R, Option 3, as described in Section C-3.02122. The one-time installation fee and monthly subscription fee will be waived.

C
C

T

ISSUED:  June 11, 1998                    ISSUED BY.        James E. Kerr                    EFFECTIVE:  June 12, 1998
                                                            Manager, Federal Tariffs
                                                            1801 Pennsylvania Avenue, N.W.
                                                            Washington, D.C.  20006

Case 1:00-cv-00148  Document 19  Filed in TXSD on 11/06/2000  Page 25 of 50

TELECOMMUNICATIONS SERVICE
SECTION C - SERVICE DESCRIPTION AND RATES

1.   GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

 .06 GENERAL CHARGES:

  .061 **Subscriber Charges:** Pursuant to Section B-6.16, the following charges and other provisions will apply, as specified below. The charges will: (i) be calculated after the application of promotional and other accounts; (ii) not be eligible to receive promotional or any other discounts; (iii) not be included to determine satisfaction of usage volume requirements; (iv) not be calculated based upon the rates shown below in Section C-1.0612 as applied to the customer's total interstate and international usage, unless otherwise specified; (v) not apply to tax, tax-like, and/or tax-related surcharges as described in Sections B-7.08 and B-7.12; and, (vi) not apply to calls using Telecommunications Relay Service (TRS) or calls originated by customers with qualified hearing or speech impairments who are certified as described in Section C-3.02112. (For purposes of this Section C-1.061 only: (1) "usage charges" means all tariffed charges appearing on a customer's invoice; and (2) "line" means a connection furnished by a Local Exchange Carrier that is presubscribed to the Company for the purpose of accommodating Customer traffic subject to this Tariff.

   .0611 The following charges will apply:

    .06111 Carrier Access Charge:

     .061111 A monthly $1.46 charge[1] per account will be applied to invoices of customers of Metered Use Service Option A (Execunet) and Metered Use Service Option NN (homeMCI One).

     .061112 A monthly $2.65 charge per ANI which is presubscribed to MCI WORLDCOM service will be applied to invoices of customers of Metered Use Service Option N (Prism Plus), Metered Use Service Option R (MCI Preferred), Metered Use Service Option U (Commercial Dial 1 Service), Metered Use Service Option EE (MCI Flat Rate), Metered Use Service Option JJ (Advanced Option I for Small Business), Metered Use Service Option KK (MCI Flat Rate Plus) and Metered Use Service Option OO (Advanced Option II for Small Business).  R

    .06112 National Access Fee (NAF):

     .061121 A monthly $3.65 charge per line which is presubscribed to MCI WORLDCOM service and which accesses MCI WORLDCOM service via switched access will be applied to invoices of customers of Metered Use Service Option C (MCI WATS), Metered Use Service Option G (Vnet), Metered Use Service Option I (MCI Prism II), Metered Use Service Option J (University WATS), Metered Use Service Option Q (MCI Vision), Metered Use Service Option W (MCI MASTERS), Metered Use Service Option X (MCI HotelDirect), Metered Use Service Option BB, Metered Use Service Option CC (University Dial 1), Metered Use Service Option HH (hospitalityMCI), Metered Use Service Option MM (networkMCI One), Metered Use Service Option PP (Masters97) and Metered Use Service Option RR (MCI WORLDCOM On-Net Services).  R

---

[1]   For monthly billing periods beginning on or after July 1, 2000, this Carrier Access Charge will not apply. For monthly billing periods beginning before July 1, 2000, this Carrier Access Charge will be applied, irrespective of the invoice date or the date the invoice is received by Customer.

Issued: July 31, 2000                  Effective: August 1, 2000

Issued by: Tariff Administrator
     1801 Pennsylvania Avenue, N.W.
     Washington, D.C. 20006

MCI WORLDCOM COMMUNICATIONS, INC.

TARIFF F.C.C NO. 1
1ST REVISED PAGE NO. 290
CANCELS ORIGINAL PAGE NO. 290

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1.   GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

   .06   GENERAL CHARGES (Continued):

      .061   Subscriber Charges (Continued):

         .0611

            .06112   National Access Fee (NAF) (Continued):

               .061122   A monthly $0.41 charge per line which is presubscribed to MCI WORLDCOM     R
                         service and which accesses MCI WORLDCOM service via Local Exchange
                         Carrier-provided Centrex will be applied to invoices of customers of Metered
                         Use Service Option C (MCI WATS), Metered Use Service Option G (Vnet),
                         Metered Use Service Option H (MCI Prism I), Metered Use Service Option I
                         (MCI Prism II), Metered Use Service Option J (University WATS), Metered Use
                         Service Option Q (MCI Vision), Metered Use Service Option W (MCI
                         MASTERS), Metered Use Service Option X (MCI HotelDirect), Metered Use
                         Service Option BB, Metered Use Service Option CC (University Dial 1),
                         Metered Use Service Option HH (hospitalityMCI), Metered Use Service Option
                         MM (networkMCI One), Metered Use Service Option PP (Masters97) and
                         Metered Use Service Option RR (MCI WORLDCOM On-Net Services).

               .061123   A monthly $0.76 charge per line which is presubscribed to MCI WORLDCOM     R
                         service and which accesses MCI WORLDCOM service via Local Exchange
                         Carrier-provided Primary Rate Interface (PRI) will be applied to invoices of
                         customers of Metered Use Service Option C (MCI WATS), Metered Use
                         Service Option G (Vnet), Metered Use Service Option H (MCI Prism I), Metered
                         Use Service Option I (MCI Prism II), Metered Use Service Option J (University
                         WATS), Metered Use Service Option Q (MCI Vision), Metered Use Service
                         Option W (MCI MASTERS), Metered Use Service Option X (MCI HotelDirect),
                         Metered Use Service Option CC (University Dial 1), Metered Use Service
                         Option HH (hospitalityMCI), Metered Use Service Option MM (networkMCI
                         One), Metered Use Service Option PP (Masters97) and Metered Use Service
                         Option RR (MCI WORLDCOM On-Net Services).

Issued: July 31, 2000                                                          Effective:  August 1, 2000

Issued by:   Tariff Administrator
             1801 Pennsylvania Avenue, N.W.
             Washington, D.C.  20006

MCI WORLDCOM COMMUNICATI

TARIFF F.C.C NO. 1
ORIGINAL PAGE NO. 291

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1. GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

.06 GENERAL CHARGES:

.061 Subscriber Charges (Continued):

.0611 National Access Fee (NAF) (Continued):

.06113 Other Provisions: The following additional provisions will apply:

.061131 For any customer which has executed a Special Customer Arrangement (SCA) before January 1, 1998, which SCA subsequently became effective and either (i) expressly forecloses any increase in charges for the services set forth in Sections C-1.061112 and C-1.06112, or (ii) contains a provision that limits by capping any increase in charges for the services set forth in Sections C-1.061112 and C-1.06112, the charges set forth in Sections C-1.061112 and C-1.06112 shall not apply during: (i) the remainder of the original term of service, so long as the rates and charges, including regulations that affect rates and charges, for the services set forth in Sections C-1.061112 and C-1.06112 are not modified; and, (ii) any optional term of service following the original term of service which the SCA permits the customer to invoke by unilateral action, so long as the rates and charges, including regulations that affect rates and charges for the services set forth in C-1.061112 and C-1.06112 are not modified. Otherwise, these charges will apply at the beginning of any new SCA term of service, including any month-to-month term of service, following the expiration of any original or optional service term.

.0611311 An SCA may be amended to add a service (with service features) not being furnished under the SCA and the charges set forth in Sections C-1.061112 and C-1.06112 shall not apply to the amended SCA so long as the requirements set forth in (i) and (ii) of Section C-1.061131 above continue to be met. Otherwise, such referenced charges will apply at the beginning of any new SCA term of service, including any month-to-month term of service, following the expiration of any original or optional service term, or the first monthly billing period following the amendment of the SCA to add new service. If the service added is Metered Use Service Option RR (MCI WorldCom On-Net Services), including Local Network Connection, and such service is being substituted for Metered Use Service Options F (MCI 800 Service), G (Vnet), Q (MCI Vision) and/or MM (networkMCI One), and, further, if the customer subscribes to new, non-resold, exchange service provided by an affiliate of the Company, the charges set forth in Sections C-1.061112 and C-1.06112 shall not apply if the customer pays charges for the substituted service that equal or exceed the charges for the service substituted for, after application of all discounts or credits, and independent of any new Option RR service or service features to which the customer subscribes.

Issued: March 7, 2000

Effective: March 8, 2000

Issued by: Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

MCI WORLDCOM COMMUNICATION

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1.    GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

   .06    GENERAL CHARGES (Continued):

      .061    Subscriber Charges (Continued):

         .0612 Federal Universal Service Fee (FUSF)[1]:

            .0612111    For MCI WORLDCOM service usage between July 1, 1999 and March 31, 2000, a charge equal to 7.2 percent of MCI WORLDCOM service usage charges will be applied to invoices of customers of Metered Use Service Option A (Execunet), Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), Metered Use Service Option T (Feature Card Services) and Metered Use Service Option NN (homeMCI One).

            .0612112    Beginning April 1, 2000, a charge equal to 8.3 percent of MCI WORLDCOM service usage charges will be applied to invoices of customers of Metered Use Service Option A (Execunet), Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), Metered Use Service Option T (Feature Card Services) and Metered Use Service Option NN (homeMCI One).

         .0612112

            .06121121    Beginning July 1, 1999, a charge equal to 6.5 percent of MCI WORLDCOM service usage charges will be applied to invoices of customers of Metered Use Service Option N (Prism Plus), Metered Use Service Option R (MCI Preferred), Metered Use Service Option U (Commercial Dial 1 Service), Metered Use Service Option EE (MCI Flat Rate), Metered Use Service Option JJ (Advanced Option I for Small Business), Metered Use Service Option KK (MCI Flat Rate Plus), and Metered Use Service Option OO (Advanced Option II for Small Business).

---

[1]  The Federal Universal Service Fee will either be included as a component of individual call charges on a customer's invoice or it may be included as part of a separate line item on a customer's invoice.

---

Issued: March 7, 2000

Issued by:   Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Effective: March 8, 2000

MCI WORLDCOM COMMUNICATIC.

TARIFF F.C.C NO. 1
ORIGINAL PAGE NO. 297

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1.    GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

.061    Subscriber Charges (Continued):

.0612 Federal Universal Service Fee (FUSF) (Continued):

.06121 Charges (Continued):

.061212 (Continued)

.0612122 For MCI WORLDCOM service usage between July 1, 1999 and October 31, 1999, a charge equal to 4.5 percent of MCI WORLDCOM service usage charges will apply to customers of Dedicated Leased Line Service, Metered Use Service Option C (MCI WATS), Metered Use Service Option F (MCI 800 Service), Metered Use Service Option G (Vnet), Metered Use Service Option H (MCI Prism I), Metered Use Service Option I (MCI Prism II), Metered Use Service Option J (University WATS), Metered Use Service Option M (MCI 900 Service), Metered Use Service Option P (MCI Forum Conference Calling), Metered Use Service Option Q (MCI Vision), Metered Use Service Option S (Virtual Private Data Services), Metered Use Service Option W (MCI MASTERS), Metered Use Service Option X (MCI HotelDirect), Metered Use Service Option Y (MCI PrePaid), Metered Use Service Option Z (MCI Exchange Card), Metered Use Service Option BB, Metered Use Service Option CC (University Dial 1), Metered Use Service Option DD (Third Party Debit Instrument Service), Metered Use Service Option FF (CFRS), Metered Use Service Option GG (MCI HyperStream Frame Relay), Metered Use Service Option HH (hospitalityMCI), Metered Use Service Option II (MCI Hemispheres International Calling Card), Metered Use Service Option LL (directlineMCI), Metered Use Service Option MM (networkMCI One), Metered Use Service Option PP (Masters97), Metered Use Service Option QQ (audioconferencing from networkMCI Conferencing), Metered Use Service Option RR (MCI WORLDCOM On-Net Services), CCSA Service, Extension Point Service, Multiple Access Data Collection Service, Program Channel Service and Wideband Service.

Issued: March 7, 2000

Effective: March 8, 2000

Issued by:    Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

TELECOMMUNICATIONS SERVICE

SECTION C - SERVICE DESCRIPTION AND RATES

1.    GENERAL DESCRIPTION OF TELECOMMUNICATIONS SERVICE

.06    GENERAL CHARGES (Continued):

.061    Subscriber Charges (Continued):

.0612 Federal Universal Service Fee (FUSF) (Continued):

.06121 Charges (Continued):

.0612123 Beginning November 1, 1999, a charge equal to 5.95 percent of MCI WORLDCOM service usage charges will apply to customers of Dedicated Leased Line Service, Metered Use Service Option C (MCI WATS), Metered Use Service Option F (MCI 800 Service), Metered Use Service Option G (Vnet), Metered Use Service Option H (MCI Prism I), Metered Use Service Option I (MCI Prism II), Metered Use Service Option J (University WATS), Metered Use Service Option M (MCI 900 Service), Metered Use Service Option P (MCI Forum Conference Calling), Metered Use Service Option Q (MCI Vision), Metered Use Service Option S (Virtual Private Data Services), Metered Use Service Option W (MCI MASTERS), Metered Use Service Option X (MCI HotelDirect), Metered Use Service Option Y (MCI PrePaid), Metered Use Service Option Z (MCI Exchange Card), Metered Use Service Option BB, Metered Use Service Option CC (University Dial 1), Metered Use Service Option DD (Third Party Debit Instrument Service), Metered Use Service Option FF (CFRS), Metered Use Service Option GG (MCI HyperStream Frame Relay), Metered Use Service Option HH (hospitalityMCI), Metered Use Service Option II (MCI Hemispheres International Calling Card), Metered Use Service Option LL (directlineMCI), Metered Use Service Option MM (networkMCI One), Metered Use Service Option PP (Masters97), Metered Use Service Option QQ (audioconferencing from networkMCI Conferencing), Metered Use Service Option RR (MCI WORLDCOM On-Net Services), CCSA Service, Extension Point Service, Multiple Access Data Collection Service, Program Channel Service and Wideband Service.

.06121    Other Provisions: The following additional provisions will apply:

.061231 A customer will not be required to pay the charges set forth in Section C-1.06121 if it demonstrates to MCI WORLDCOM's reasonable satisfaction that it is acquiring MCI WORLDCOM's services for resale, i.e., not for its own internal use.

Issued by:    Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Case 1:00-cv-00148   Document 19   Filed in TXSD on 11/06/2000   Page 31 of 50

## TELECOMMUNICATIONS SERVICE
### SECTION C - SERVICE DESCRIPTIONS AND RATES

3.   METERED USE SERVICE (Continued)

    .02   Option A (Execunet) (Continued)

        .025   Premier Calling Plans: Execunet customers (Dial "1" only) may enroll in one or more of the following plans per telephone number at the same time. Those customers who enroll in more than one plan at the same time are limited to a combination of: (1) one interstate, one intrastate, and/or one international plan in any one month or, (2) two international plans in any one month. TRS calls are not eligible for discounting under Premier Calling Plans. All Premier Calling Plans are limited to three telephone numbers per account. Direct dialed calls will be billed at the Premier Calling Plan rates listed herein, unless the customer would otherwise be billed at a lower rate as specified in Section C-3.021111 for a call during the same time period, excluding the first hour for the PrimeTime, PrimeTime Plus, MCI AnyTime, SuperSaver and Sure-Save Options and excluding the MCI Sure Savings Option.

        In each monthly period in which a subscriber's usage charges under a Premier Calling Plan (excluding Basic Calling Plan Option 2, Basic Calling Plan Option 3, Basic Calling Plan Option 8, Basic Calling Plan Option 9, Basic Calling Plan Option 11, Basic Calling Plan Option 12, MCI AnyTime, MCI Family Assist, PrimeTime Plus, Sure-Save Area Code Option, Sure-Save Close, Sure-Save Reach, Sure-Save Savings Volume Discount Plan, Sure-Save Sense and Sure-Save Volume Discount Plan) are less than $5.00, a $5.00 minimum charge will apply. This charge will be applied against the customer's Premier Calling Plan usage in the month it is charged.

        When a domestic Dial "1" call under a Premier Calling Plan (excluding Sure-Save Volume Discount Plan, Sure-Save Savings Volume Discount Plan, and Sure-Save Reach) begins in one time-of-day rate period and ends in another, the rate in effect for the rate period in which the call begins applies to the entire call.

---

Issued: March 7, 2000

Issued by:      Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C.  20006

Effective: March 8, 2000

CMPDF - www.fastio.com

MCI WORLDCOM COMMUNICAT᠁ ᠁NC.

TELECOMMUNICATIONS SERVICE
SECTION C - SERVICE DESCRIPTIONS AND RATES

3.   METERED USE SERVICE (Continued)

   .02   Option A (Execunet) (Continued)

      .025   Premier Calling Plans (Continued)

         .02510   Basic Calling Plan Options (Continued):        Z

            .0251013 Basic Calling Plan Option 11[1]:A variation of Option A (Execunet), Basic Calling Plan Option 11 offers calling from the U.S. Mainland and Hawaii to the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Puerto Rico, Guam, CNMI and the international locations set forth in Section C-3.07337. Customers enrolled in this plan will be charged a $4.95 monthly recurring charge.     Z

                 Beginning February 5, 2000 customers of Basic Calling Plan Option 11 will receive service under Basic Calling Plan Option 12

                 Benefits:  Customers enrolled in this plan will receive the following benefits.

                       Dial "1" Access:  Customers will be charged $0.10 per minute from 7:00 a.m. through 6:59 p.m. on Mondays through Fridays and $0.05 per minute from 7:00 p.m. through 6:59 a.m. on Mondays through Fridays and all day Saturdays and Sundays for Dial "1" usage which originates in the U.S. Mainland and Hawaii and terminates in the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Puerto Rico, Guam, and CNMI.

                       Customers will be charged the rates set forth in Section C-3.07337 for Dial "1" usage which originates in the U.S. Mainland and Hawaii and terminates in the international locations set forth in C-3.07337. Customers enrolled in this plan who also enroll in Option A International Savings Plan 4 (ISP4), as set forth in Section C-3.02526, or Option A International Savings Plan 6 (ISP6), as set forth in Section C-3.02528 will be charged the rates set forth in those Sections for Dial "1" usage that originates in the U.S. Mainland and Hawaii and terminates in the international locations set forth in those Sections.

                       Calling Card Access:  Customers enrolled in this plan will be charged $0.69 per minute, and a $1.25 per-call surcharge in lieu of the standard tariffed calling card access surcharge, for domestic Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card) and Metered Use Service Option T (Feature Card Services) usage, excluding the customer's usage which terminates to the customer's billed ANI. Customers, excluding customers who are enrolled in Option A International Savings Plan 7, as set forth in Section C-3.02529, or Option A International Savings Plan 8, as set forth in Section C-3.02530, will be charged $0.07 per-minute on Mondays through Saturdays and $0.05 per-minute on Sundays, and the Company will waive the 25 per-call calling card access surcharge, for domestic Option B, Option D, and Option T usage.

                       Personal 800 Access: Customers enrolled in this plan will be automatically enrolled in Personal 800 Plan R, Option 3, as set forth in Section C-3.0212. The one-time installation fee and monthly subscription fee will be waived.

---

[1]  Beginning January 22, 2000, service under Basic Calling Plan Option 11 is not available to new subscribers to the plan.

Issued: May 11, 2000                                               Effective: May 12, 2000

Issued by:    Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C.  20006

MCI WORLDCOM COMMUNICATION

)　　TARIFF F.C.C NO. 1
6TH REVISED PAGE NO. 398
CANCELS 5TH REVISED PAGE NO. 398

TELECOMMUNICATIONS SERVICE
SECTION C - SERVICE DESCRIPTIONS AND RATES

3.　　METERED USE SERVICE (Continued)

　　.02　　Option A (Execunet) (Continued)

　　　　.025　　Premier Calling Plans (Continued)

　　　　　　.02510　　Basic Calling Plan Options (Continued):

　　　　　　　　.0251014 Basic Calling Plan Option 12:  A variation of Option A (Execunet), Basic Calling Plan Option 12 offers calling from the U.S. Mainland and Hawaii to the U.S. Mainland, Alaska, Hawaii, the U.S. Virgin Islands, Puerto Rico, Guam, CNMI and the international locations set forth in Section C-3.07337. Customers enrolled in this plan will be charged a $5.95 monthly recurring charge.

　　　　　　　　　　Benefits:  Customers enrolled in this plan will receive the following benefits.

　　　　　　　　　　　　Customers, excluding customers who are enrolled in Option A International Savings Plan 7, as set forth in Section C-3.02529, or Option A International Savings Plan 8, as set forth in Section C-3.02530, will be charged $0.09 per minute from 7:00 a.m. through 6:59 p.m. on Mondays through Fridays and $0.05 per minute from 7:00 p.m. through 6:59 a.m. on Mondays through Fridays and all day Saturdays and Sundays for the customer's domestic Dial "1" usage and the customer's domestic Metered Use Service Option B (Card Compatibility), Metered Use Service Option D (Credit Card), and Metered Use Service Option T (Feature Card Services) usage which terminates to the customer's billed ANI.  The Company will waive the per-call calling card access surcharge for the customer's domestic Option B, Option D, and Option T usage which terminates to the customer's billed ANI.  Customers will be charged $0.75 per minute, and a $1.25 per-call surcharge in lieu of the standard tariffed calling card access surcharge, for domestic Option B Option D, and Option T usage, excluding the customer's usage which terminates to the customer's billed ANI.

　　　　　　　　　　　　When a domestic Basic Calling Plan Option 12 Dial "1" call is established in one time-of-day rate application period and ends in another, the rate in effect in the rate period in which the call begins applies to the entire call.

　　　　　　　　　　　　Customers will be charged the rates set forth in Section C-3.07337 for Dial "1" usage which originates in the U.S. Mainland and Hawaii and terminates in the international locations set forth in C-3.07337. Customers enrolled in this plan who also enroll in Option A International Savings Plan 4 (ISP4), as set forth in Section C-3.02526, or Option A International Savings Plan 6 (ISP6), as set forth in Section C-3.02528, Option A International Savings Plan 7 (ISP7), as set forth in Section C-3.02529, or Option A International Savings Plan 8 (ISP8), as set forth in Section C-3.02530, will be charged the rates set forth in those Sections for Dial "1" usage which originates in the U.S. Mainland and Hawaii and terminates in the international locations set forth in those Sections.

　　　　　　　　　　　　Personal 800 Access: Customers enrolled in this plan will be automatically enrolled in Personal 800 Plan R, Option 3, as set forth in Section C-3.0212. The one-time installation fee and monthly subscription fee will be waived.

Issued: July 31, 2000

Issued by:　Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

Effective: August 1, 2000

MCI WORLDCOM COMMUNICA~   ~NC.

TELECOMMUNICATIONS SERVICE
SECTION C - SERVICE DESCRIPTIONS AND RATES

3.    METERED USE SERVICE (Continued)

.07    INTERNATIONAL SERVICE (Continued)

.073    Usage Rates

.07337    Option A (Execunet) Basic Calling Plan Option 5, Basic Calling Plan Option 6, Basic Calling Plan    T
Option 7, Basic Calling Plan Option 8, Basic Calling Plan Option 9, Basic Calling Plan Option 10,
Basic Calling Plan Option 11, Basic Calling Plan Option 12, Basic Calling Plan Option 13, Basic
Option Plan 14, Domestic Savings Calling Plan, MCI One Savings Plan II, Option NN (homeMCI    T
One) and Option OO (Advanced Option II for Small Business):  For Metered Use Service Option A
(Execunet) Basic Calling Plan Option 5, Basic Calling Plan Option 6, Basic Calling Plan Option 7,
Basic Calling Plan Option 8, Basic Calling Plan Option 9, Basic Calling Plan Option 10, Basic Calling
Plan Option 11, Basic Calling Plan Option 12, Basic Calling Plan Option 13, Basic Calling Plan
Option 14, Domestic Savings Calling Plan and MCI One Savings Plan II, Metered Use Service
Option NN (homeMCI One) and Metered Use Service Option OO (Advanced Option II for Small
Business) Dial "1" calls that originate in the U.S. Mainland and Hawaii and terminate in the following
international locations, the following per-minute usage charges will apply during all times of day.
Option A (Execunet) Basic Calling Plan Option 6, Option A (Execunet) Domestic Savings Calling
Plan and Option A (Execunet) MCI One Savings Plan II usage will be calculated on a 60-second
minimum duration basis with additional 60-second increments.  Option NN usage will be calculated
on a 60-second minimum duration basis with additional 6-second increments; Option OO usage will
be calculated on a 30-second minimum duration basis with additional 6-second increments; except
both Option NN and Option OO usage to the Atlantic, Pacific, and Indian Ocean Inmarsat Standard A
Service locations will be calculated on a 60-second minimum duration basis with additional 60-
second increments.

| Country | Rate | Country | Rate | Country | Rate |
|---|---|---|---|---|---|
| Afghanistan | $10.19 | Brazil | $2.53 | Ecuador | $2.60 |
| Albania | 4.81 | British Virgin Islands | 2.02 | Egypt | 3.06 |
| Algeria | 3.09 | Brunei | 2.72 | El Salvador | 2.45 |
| American Samoa | 0.50 | Bulgaria | 2.82 | Equatorial Guinea | 5.94 |
| Andorra | 2.02 | Burkina Faso | 4.66 | Eritrea | 3.67 |
| Angola | 6.29 | Burundi | 6.28 | Estonia | 3.95 |
| Anguilla | 2.14 | Cambodia | 5.74 | Ethiopia | 3.62 |
| Antarctica (Casey, Davis, | | Cameroon | 3.07 | Faeroe Islands | 1.85 |
| Mawson, and Macquarie | | Canada | 0.73 | Falkland Islands | 5.28 |
| Island) | 6.33 | Cape Verde Islands | 3.75 | Fiji Islands | 3.72 |
| Antarctica (Scott Base) | 2.65 | Cayman Islands | 2.14 | Finland | 1.97 |
| Antigua (Barbuda) | 2.08 | Central African | | France | 1.80 |
| Argentina | 2.63 | Republic | 6.04 | French Antilles  (Including | |
| Armenia | 3.46 | Chad | 7.03 | Martinique, St. Barthelemy | |
| Aruba | 2.00 | Chile | 2.44 | and  St. Martin) | 2.06 |
| Ascension Island | 3.50 | China | 3.63 | French Guiana | 2.35 |
| Australia (Including | | Christmas Island | 2.07 | French Polynesia | 3.23 |
| Tasmania) | 2.07 | Cocos Islands | 2.07 | Gabon | 3.04 |
| Austria | 1.99 | Colombia | 2.58 | Gambia | 2.86 |
| Azerbaijan | 3.39 | Comoros | 5.89 | Georgia | 3.46 |
| Bahamas | 1.62 | Congo | 5.12 | Germany | 1.69 |
| Bahrain | 2.82 | Cook Islands | 6.46 | Ghana | 3.03 |
| Bangladesh | 4.83 | Costa Rica | 2.28 | Gibraltar | 2.37 |
| Barbados | 2.08 | Croatia | 2.43 | Greece | 2.65 |
| Belarus | 3.46 | Cuba | 2.60 | Greenland | 2.56 |
| Belgium | 2.09 | Cyprus | 2.53 | | |
| Belize | 2.58 | Czech Republic | 2.64 | | |
| Benin | 2.84 | Denmark | 1.98 | | |
| Bermuda | 1.75 | Diego Garcia | 4.86 | | |
| Bhutan | 7.28 | Djibouti | 4.40 | | |
| Bolivia | 2.74 | Dominica | 2.25 | | |
| Bosnia-Herzegovina | 2.47 | Dominican Republic | 2.24 | | |
| Botswana | 2.57 | Easter Island[1] | 2.44 | | |

M

M

[1]  Service to this country is available only with the assistance of an operator.

CERTAIN MATERIAL PREVIOUSLY LOCATED ON THIS PAGE CAN NOW BE FOUND ON 4TH REVISED PAGE NO. 737.

Issued: May 11, 2000                                                Effective: May 12, 2000

Issued by:    Tariff Administrator
1801 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

MCI WORLDCOM COMMUNICATI    .C.

TELECOMMUNICATIONS SERVICE
SECTION C - SERVICE DESCRIPTIONS AND RATES

3.    METERED USE SERVICE (Continued)

 .07    INTERNATIONAL SERVICE (Continued)

  .073    Usage Rates

   .07337    Option A (Execunet) Basic Calling Plan Option 5, Basic Calling Plan Option 6, Basic Calling Plan Option 7, Basic Calling Plan Option 8, Basic Calling Plan Option 9, Basic Calling Plan Option 10, Basic Calling Plan Option 11, Basic Calling Plan Option 12, Basic Calling Plan Option 13, Basic Calling Plan Option 14, Option A (Execunet) Domestic Savings Calling Plan, Option A (Execunet) MCI One Savings Plan II, Option NN (homeMCI One) and Option OO (Advanced Option II for Small Business) (Continued):

| Country | Rate | | Country | Rate | Country | Rate |
|---|---|---|---|---|---|---|
| Grenada (Including Carriacou) | $2.30 | M | Mauritania | $4.37 | Singapore | $2.24 |
| Guadeloupe | 2.11 | | Mauritius | 4.76 | Slovakia | 2.52 |
| Guantanamo Bay | 2.60 | | Mayotte Island | 5.89 | Slovenia | 2.57 |
| Guatemala | 2.47 | | Mexico | 1.66 | Solomon Islands | 5.14 |
| Guinea | 3.75 | | Micronesia | 3.11 | Somalia | 3.87 |
| Guinea Bissau | 6.46 | | Moldova | 3.97 | South Africa | 2.44 |
| Guyana | 3.19 | | Monaco | 1.80 | Spain (Including Balearic Islands, Canary Islands, | |
| Haiti | 2.49 | | Mongolia | 7.51 | Ceuta and Melilla) | 2.21 |
| Honduras | 2.65 | | Montserrat | 2.22 | Sri Lanka | $4.65 |
| Hong Kong | 2.49 | | Morocco | 3.51 | St. Helena | 4.55 |
| Hungary | 2.35 | | Mozambique | 5.08 | St. Kitts | 2.20 |
| Iceland | 2.26 | | Myanmar | 8.36 | St. Lucia | 2.21 |
| India | 3.71 | | Namibia | 2.75 | St. Pierre/Miquelon | 1.80 |
| Indonesia | 3.03 | | Nauru | 5.28 | St. Vincent/Grenadines | 2.29 |
| Iran | 3.56 | | Nepal | 4.46 | Sudan | 5.57 |
| Iraq | 4.33 | | Netherlands | 1.78 | Suriname | 3.89 |
| Ireland | 1.83 | | Netherlands Antilles | 2.05 | Swaziland | 2.71 |
| Israel | 2.67 | | Nevis | 2.20 | Sweden | 1.78 |
| Italy | 2.07 | | New Caledonia | 3.00 | Switzerland | 1.89 |
| Ivory Coast | 3.67 | M | New Zealand | 2.65 | Syria | 4.76 |
| Jamaica | 2.24 | | Nicaragua | 2.58 | Taiwan | 2.67 |
| Japan | 2.00 | | Niger | 3.75 | Tajikistan | 3.46 |
| Jordan | 2.66 | | Nigeria | 2.73 | Tanzania | 3.06 |
| Kazakhstan | 3.46 | | Niue Island | 6.82 | Thailand | 2.72 |
| Kenya | 3.07 | | Norfolk Island | 6.33 | Togo | 3.14 |
| Kiribati | 4.71 | | Norway | 1.82 | Tonga | 4.24 |
| Korea, Democratic | | | Oman | 2.84 | Trinidad/Tobago | 2.27 |
| People's Republic of | 7.37 | | Pakistan | 5.59 | Tunisia | 2.82 |
| Korea, Republic of | 2.49 | | Palau | 5.10 | Turkey | 2.52 |
| Kuwait | 2.68 | | Palestine | 2.67 | Turkmenistan | 3.46 |
| Kyrgyzstan | 3.45 | | Panama | 2.45 | Turks and Caicos Islands | 2.13 |
| Laos | 7.92 | | Papua New Guinea | 3.02 | Tuvalu | 7.96 |
| Latvia | 4.08 | | Paraguay | 3.04 | Uganda | 3.04 |
| Lebanon | 4.29 | | Peru | 2.73 | Ukraine | 3.46 |
| Lesotho | 2.61 | | Philippines | 2.96 | United Arab Emirates | 3.46 |
| Liberia | 2.72 | | Pitcairn Island | 2.65 | United Kingdom | 1.50 |
| Libya | 2.91 | | Poland | 2.21 | Uruguay | 2.63 |
| Liechtenstein | 1.89 | | Portugal (Including Azores and Madeira Islands) | 2.23 | Uzbekistan | 3.46 |
| Lithuania | 3.62 | | Qatar | 2.83 | Vanuatu | 6.41 |
| Luxembourg | 1.90 | | Reunion Island | 4.70 | Vatican City | 2.07 |
| Macao | 3.53 | | Romania | 3.14 | Venezuela | 1.87 |
| Macedonia | 2.45 | | Russia | 3.46 | Vietnam | 4.04 |
| Madagascar | 6.96 | | Rwanda | 5.00 | Wallis and Futuna | 6.29 |
| Malawi | 2.56 | | San Marino | 1.91 | Western Sahara | 2.21 |
| Malaysia | 2.74 | | Sao Tome | 6.61 | Western Samoa | 4.64 |
| Maldives | 4.65 | | Saudi Arabia | 2.93 | Yemen, Republic of | 2.78 |
| Mali Republic | 4.58 | | Senegal | 3.94 | Yugoslavia | 2.65 |
| Malta | 3.05 | | Seychelles Islands | 4.99 | Zaire | 2.73 |
| Marshall Islands | 3.12 | | Sierra Leone | 4.12 | Zambia | 2.33 |
| | | | | | Zimbabwe | 2.62 |

CERTAIN MATERIAL LOCATED ON THIS PAGE WAS FORMERLY FOUND ON 3RD REVISED PAGE NO. 736.

Issued: May 11 2000                                                                         Effective: May 12, 2000

Issued by:   Tariff Administrator
             1801 Pennsylvania Avenue, N.W.
             Washington, D.C.  20006

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| ANGELA HUNT, on behalf of Herself and All Others Similarly Situated, Plaintiffs, | ) ) ) ) | |
| v. | ) ) ) | No. 3:00-0244 Judge Nixon |
| PRISON REALTY TRUST, INC., et al., Defendants. | ) ) | |

### MEMORANDUM

Pending before the Court is Plaintiff's Motion to Remand and Motion for an award of fees and expenses, (Doc. No. 12), to which Defendants have responded, (Doc. No. 19). On May 15, 2000, a hearing was held on Plaintiff's Motion to Remand. (Doc. No. 28.) For the reasons stated below, the Motion to Remand is denied. Accordingly, Plaintiff's Motion for an award of fees and expenses is also denied.

### I. BACKGROUND

On February 23, 2000, Plaintiff Angela Hunt initiated this class action in the Chancery Court for Davidson County, Tennessee against Defendants, Prison Realty Trust, Inc., Correctional Management Services, Juvenile and Jail Facilities Management Services, Inc., Prison Management Services, Inc., and DOES 1-100, (collectively referred to as "CCA Defendants"). (See Doc. No. 1.) Defendants are correctional service providers that operate correctional facilities throughout the United States. (Doc. No. 20 at 1.)

This document was entered on the docket in compliance with Rule 58 and / or Rule 79 (a).

FRCP, on 8/25/00 By AKT

30

Plaintiff Hunt brings this civil action collectively on behalf of all recipients of collect phone calls from inmates confined in prison facilities operated by the Defendants. (See generally Compl.)[1] Plaintiff alleges violations of the Tennessee Consumer Protection Act of 1977 ("TCPA"), and a claim for common law unjust enrichment arising from Defendants' Inmate Pay Telephone Agreements (the "Agreements") with telephone service providers. (Compl. at ¶¶19-25.) Under the Agreements, collect telephone services are furnished to inmates by a single provider selected by the Defendants. (Compl. at ¶12.) Specifically, Plaintiff alleges that Defendants have entered into agreements with a single telephone service provider, granting the provider exclusive rights to furnish telephone services to inmates incarcerated at Defendants' facilities, to the exclusion of other providers. (Id.) Plaintiff further alleges that in return, the provider is forced to "kick-back" large portions of the charges it collects from Plaintiff and other class members to the Defendants (hereinafter referred to as "the kickback scheme"). (Id.) Plaintiff alleges that the Agreements have resulted in the charging of unconscionable rates for phone services and illegal commissions paid to Defendants by the telephone service providers via the kickback scheme. (Compl. at ¶¶13-15.)

On March 17, 2000, Defendants removed this action pursuant to 28 U.S.C. §1441, alleging that this Court has original jurisdiction pursuant to 28 U.S.C. §1331. (Doc. No. 1.) Specifically, Defendants contend that Plaintiff's claims constitute a challenge to the rates approved by the Federal Communications Commission ("FCC"), and as such, are completely preempted by the Federal Communications Act ("FCA"). (Id. at ¶10.)

---

[1] A copy of the Complaint is attached to Defendants' Notice of Removal. (Doc. No. 1.)

CVtPDF - www.fesko.com

On April 12, 2000, Plaintiff filed a Motion to Remand, requesting that this Court remand the case to the Chancery Court for Davidson County, Tennessee. (Doc. No. 12.) Plaintiff argues that this action is not removable because she has not asserted federal causes of action on the face of the Complaint, but rather has alleged state-law causes of action under the TCPA and Tennessee common law. (Doc. No. 13 at 2.) Insofar as Defendants claim that the FCA preempts Plaintiff's claims, Plaintiff argues that this is simply an invocation of a preemption defense which, as a matter of law, cannot confer removal jurisdiction on this Court. (Id.) Further, Plaintiff argues that removal jurisdiction pursuant to the complete preemption doctrine is also lacking because the FCA does not provide relief for her claims. Plaintiff asserts that this action challenges Defendants' exclusive dealing arrangements and the illegal kickbacks it collects, and does not challenge the reasonableness of any tariff or rate charged by any service provider. (Id.) In support of this argument, Plaintiff notes that she has not named any telephone service providers as defendants. (Id.)

In Response, Defendants contend that removal is proper in this case under the doctrine of complete preemption. (See generally Doc. No. 20.) Defendants argue that the Complaint challenges the rates that Plaintiffs must pay when they voluntarily accept collect calls from incarcerated callers. (Id. at 2.) In support, Defendants point to eleven claims in the Complaint wherein Plaintiffs allege that the exclusive contracts have the effect of imposing "*unconscionable and excessive*" rates upon Plaintiffs who accept collect phone calls. (Id. at 2-3) (citing Compl. at ¶¶1, 3, 5, 6, 7, 11, 13, 14, 15, 21, 24). Defendants break Plaintiff's Complaint down into four main claims: (1) the rates are excessive; (2) Plaintiffs are subject to discriminatory rates because they pay more for collect calls than members of the general public; (3) Plaintiffs challenge the

3

exclusivity of the telephone services contracts; and (4) Plaintiffs challenge the commission provisions of the telephone service contracts. (Id. at 9.) Thus, Defendants argue that because Plaintiff's claims essentially challenge the rates, services, and practices of the telephone service provider, this suit is governed by Sections 201 to 205 of the FCA which regulate and grant the FCC plenary authority over telephone companies' interstate rates, services, and practices. (Id. at 5-6.) Defendants argue that the fact that Plaintiff chose not to sue the telephone service provider, but instead sued Defendants, should not alter the Court's analysis in applying complete preemption. (Id. at 10.)

Defendants argue that the specific preemptive effect of the FCA is reflected in the filed tariff or rate doctrine. (Id. at 6-8.) Specifically, Defendants argue that a suit concerning the validity or reasonableness of charges or conditions set forth in a FCC approved tariff is governed by the FCA. (Id. at 9.) Defendants argue that although Plaintiff cloaks her Complaint in terms of a challenge to the *agreements* between Defendants and telephone service providers, the terms of these agreements are based upon the tariffs that the telephone service providers have filed with the FCC. (Id.)

And finally, Defendants contend that the filed rate doctrine forbids courts from awarding any relief, including damages, that would result in customers effectively being charged a rate different from the rate approved by the FCC. (Id. at 10.) Defendants note that Plaintiff has requested both injunctive relief and restitution for "the entire amounts they collected under the agreements and contracts . . . ." (Id.) (quoting Compl. at 6-7.) Defendants argue that the effect of this requested relief would be to lower the rates and commission practices authorized by the tariffs approved by the FCC. (Id.)

4

## II. LEGAL STANDARD

A civil action may be removed from state to federal court if it could have been brought originally in federal court. 28 U.S.C. §1441(a) (West 2000). If a court lacks diversity jurisdiction over an action, as in the instant case, the action must "arise under the Constitution, laws or treaties of the United States." 28 U.S.C. §1331 (West 2000). In a motion to remand, the party who removed the action to federal court bears the burden of establishing federal jurisdiction. Wilson v. Republic Iron & Steel Co., 257 U.S. 92, 97 (1921); W. Watson v. First Union Nat'l Bank of S.C., 837 F.Supp. 146, 147-48 (D.S.C. 1993).

In construing a motion to remand, a court "must assume as true all factual allegations of the complaint. It also must resolve any uncertainties as to the current state of controlling substantive law in favor of the plaintiff." Batoff v. State Farm Ins. Co., 977 F.2d 848, 851-52 (3d Cir. 1992); see also Alexander v. Electronic Data Sys. Corp., 13 F.3d 940, 949 (6th Cir. 1994). Removal statutes must be strictly construed and any doubts about whether removal is proper must be resolved in favor of state court jurisdiction. See In re Business Men's Assur. Co. of America, 992 F.2d 181, 183 (8th Cir. 1993). Furthermore, because motions to remand are generally unreviewable, see 28 U.S.C. § 1447(d) (West 2000), a court must carefully consider whether a party's claim for access to a federal forum is properly invoked. See Zuniga v. Blue Cross and Blue Shield of Michigan, 52 F.3d 1395, 1400 (6th Cir. 1995) (holding that "'[i]f a district court remands a case based on the grounds listed in [Section 1447(c)], this [C]ourt cannot review the remand order.' This is true even if the district court's decision to remand is 'based on erroneous principles or analysis'") (internal citations omitted).

5

A.    Well-Pleaded Complaint Rule

Determination of whether removal to federal court is proper is made by reference to the "well-pleaded complaint" rule. Franchise Tax Board v. Constr. Laborers Vacation Trust, 463 U.S. 1, 9-10 (1983). Under this doctrine, the "plaintiff is master of his complaint, and the fact that the wrong asserted could be addressed under either state or federal law does not ordinarily diminish the plaintiff's right to choose a state law cause of action." Alexander, 13 F.3d at 943; see also Louisville & Nashville R.R. v. Mottley, 211 U.S. 149 (1908). In other words, a "defendant cannot, merely by injecting a federal question into an action that asserts what is plainly a state law-claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated." Warner v. Ford Motor Co., 46 F.3d 531, 534 (6th Cir. 1995). It is "settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of [federal] pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." Caterpillar, Inc. et al. v. Williams, et al., 482 U.S. 386, 392 (1987). The federal question must appear on the face of the plaintiff's well-pleaded complaint, and/or the federal right or immunity must be an essential element of plaintiff's cause of action. Franchise Tax Board, 463 U.S. at 9-10.

B.    Complete Preemption

The doctrine of "complete preemption" constitutes an exception to the "well-pleaded complaint" rule. If Congress intends the preemptive force of a federal statute to be so extraordinary that it "completely preempts" an area of state law, any complaint alleging claims under that area of state law is presumed to allege a claim arising under federal law. See

6

<u>Metropolitan Life Ins. Co. v. Taylor</u>, 481 U.S. 58, 63-65 (1987) (stating that the doctrine

"converts an ordinary state common law complaint into one stating a federal claim for purposes of

the well-pleaded complaint rule"); <u>Avco Corp. v. Aero Lodge No. 735</u>, 390 U.S. 557 (1968).

The Sixth Circuit has held that the congressional intent "necessary to confer removal jurisdiction

upon the federal district courts through complete preemption is expressed through the creation of

a parallel federal cause of action that would 'convert' a state cause of action into the federal

action for purposes of the well-pleaded complaint rule." <u>Strong v. Telectronics Pacing Systems,

Inc.</u>, 78 F.3d 256, 261 (6th Cir. 1996) (<u>citing</u> <u>Warner</u>, 46 F.3d at 534-35).

 A complaint may thus be removed to federal court and will be treated as alleging a

federal cause of action, notwithstanding that on its face, the complaint alleges only a state-law

cause of action. <u>Hanks v. General Motors Corp.</u>, 26 F.Supp.2d 977, 979 (E.D. Mich. 1998).

However, complete preemption is applied in very limited circumstances and courts should be

"reluctant to find" that a federal statute completely preempts state law. <u>Warner</u>, 46 F.3d at 534.

Indeed, the Supreme Court has found only two federal statutes to have this broad preemptive

scope: §301 of the Labor Management Relations Act, <u>Avco, supra</u>, and §502(a)(1)(B) of the

Employee Retirement Income and Security Act, <u>Metropolitan Life, supra</u>.

## III. DISCUSSION

 Given that Plaintiff's Complaint does not state a federal claim on its face, this action may

not be removed unless Defendant can establish that the exception of complete preemption applies.

Defendants contend that the essence of Plaintiff's claims is a challenge to the rates contained in

FCC-approved tariffs which class members must pay when they accept collect calls from

incarcerated callers.  As such, Defendants argue that Plaintiff's claims are subject to complete

7

CVisPDF - www.fastio.com

preemption under the FCA which provides a parallel federal cause of action for claims attacking FCC-approved rates.

A.    The Federal Communications Act, 47 U.S.C. §§151-613

The purpose of the FCA is to "regulat[e] interstate and foreign commerce in communication by wire and radio so as to make available . . . to all people of the United States a rapid, efficient . . . communication service with adequate facilities at reasonable charges." 47 U.S.C. §151.  As such, the FCA provides that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b).  Section 207 of the Act provides that any person alleging harm by a carrier under Section 201(b) may make a complaint to the FCC under Section 208 or bring suit in federal court.  47 U.S.C. §207.  Section 205 allows the FCC to enjoin a telephone company from continuing unlawful rates, services, or practices.  In addition, a party may recover damages under Sections 207-209 of the Act.

Section 203 of the FCA requires all common carriers of interstate and foreign telecommunications to file a schedule of their charges, as well as the classifications, practices, and regulations affecting such charges.  47 U.S.C. §203.  A common carrier may only charge the rates listed in the schedule, otherwise known as a tariff.  47 U.S.C. §203(c)(1).  Under the filed tariff doctrine, deviation from the filed rate is not permitted upon any pretext, and carriers and customers are charged with notice of it and must abide by it unless the FCC finds it unreasonable. Funeral Financial Services, Ltd. v. NOS Communications, Inc., 17 F.Supp.2d 781, 782 (N.D. Ill. 1998); see also Louisville & Nashville R. Co. v. Maxwell, 237 U.S. 94 (1915) (describing the filed

8

CSkPDF - www.fasisu.com

tariff doctrine in the context of the Interstate Commerce Act upon which the FCA's filed tariff doctrine is based). Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. Id. Thus, "[t]he filed tariff doctrine simply forbids a regulated entity to charge rates for its services other than those properly filed with the appropriate federal regulatory authority, and therefore forbids courts from ordering relief that would contravene the filed tariff." Kutner v. Sprint Communications Co. L.P., 971 F.Supp. 302, 305-306 (W.D. Tenn. 1997) (internal quotations omitted).

Because "allowing attacks on filed rates in judicial proceedings would entangle the courts in the rate making process and undermine the regulatory agency's authority," the Supreme Court has withdrawn the power to alter the filed rate from the courts. Id. at 306 (citing Montana-Dakota Util. Co. v. Northwestern Public Serv. Co., 341 U.S. 246, 251 (1951) (holding that the "right to a reasonable rate is the right to the rate which the Commission files or fixes . . . [and] the courts can assume no right to a different one")). "This restriction precludes not only the award of remedies that actually change the filed rate, but also of remedies that would have that effect." Id. (citing Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 579 (1981) (holding that "[i]t would undermine the congressional scheme of uniform rate regulation . . . to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the Act")). Because a tariff filed with a federal agency "is the equivalent of a federal regulation, . . . a suit to enforce it, and even more clearly a suit to invalidate it as unreasonable under federal law, . . . arise under federal law." Cahnmann v. Sprint Corp., 133 F.3d 484, 488 (7th Cir. 1998) (internal citations omitted). Where a claim challenges the validity or reasonableness of a filed rate, federal law occupies the whole field, displacing state law. Id. at 489. Accordingly, such

9

claims may be properly removed under the doctrine of complete preemption. See Cahnmann, 133 F.3d at 488 (holding that the FCA extinguishes the right to bring a state-law suit that challenges a tariff), Funeral Financial Services, supra.

Thus, Congress' intent to completely preempt the area of rate-setting and to vest the FCC with primary jurisdiction to determine the validity of tariffs is clear in light of the FCA's incorporation of the filed tariff doctrine. In addition, Congress has expressed the necessary intent to confer removal jurisdiction through complete preemption by creating a parallel federal cause of action via Section 207 of the FCA that would "convert" a state-law cause of action into a federal action for purposes of the well-pleaded complaint rule. Accordingly, if Plaintiff's claims challenge the validity of the rates contained in FCC-approved tariffs, and thus fall within the scope of the federal cause of action, they necessarily arise under federal law and are subject to removal via the complete preemption doctrine. See Franchise Tax Board, 463 U.S. at 24 (noting that "[i]t is well-settled that "if a federal cause of action completely preempts a state cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law").

B.    Analysis

Plaintiff argues that this case does not challenge the validity or reasonableness of rates charged by a common carrier, and as such, is not subject to removal under the complete preemption doctrine. (Doc. No. 13 at 1-2.) Rather, Plaintiff contends that her claims challenge Defendants' actions of entering into exclusive dealing arrangements with telephone service providers and receiving "kick-backs" from the service providers. (Id.) Plaintiff further argues that the FCA does not offer a parallel federal remedy for her claims because the FCA does not apply to the Defendants who are not common carriers, but rather are in the business of prison

**10**

CUtPDF - www.fasta.com

management. (Id. at 6) (noting that Sections 207 and 208 of the FCA only provide federal claims for actions undertaken by common carriers). Moreover, Plaintiff argues that the FCA does not provide remedies for the damages caused by Defendants' actions. (Id. at 6-7.)

A court may examine the entire record to determine if the real nature of a plaintiff's claim is federal, notwithstanding the plaintiff's characterization to the contrary, when the plaintiff has, by "artful pleading," attempted to defeat defendant's right to a federal forum. See Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 397 n.2 (1981). A complainant cannot "avoid federal jurisdiction simply by omitting from the complaint federal law essential to his claim, or by casting in state law terms a claim that can be made only under federal law." Harper v. San Diego Transit Corp., 764 F.2d 663, 666 (9th Cir. 1985). A complaint that is "artfully pleaded" to avoid federal jurisdiction may be recharacterized as one arising under federal law. Franchise Tax Board, 463 U.S. at 22-23.

Upon review of the record in this case, the Court finds that the true gravamen behind Plaintiff's Complaint is a challenge to the reasonableness of the rates charged by the phone companies. Although Plaintiff chose not to sue the phone companies and she is correct that the FCA provides federal remedies only for actions taken by common carriers, a review of the Complaint reveals that the true essence of her claims is a challenge to the reasonableness of the rates contained in the tariffs filed with the FCC.[2] In determining whether a complaint challenges an FCC-approved rate, courts look both to the nature of the claim as well as to the relief sought. See Cahnmann, 133 F.3d at 488-89, 490 (holding that because the principal relief sought via

---

[2] Defendants have provided a copy of a tariff filed with the FCC by one of the phone companies which includes the FCC-approved rate for collect phone calls. (Doc. No. 27, Ex.A at 30.)

11

plaintiff's fraud claim was damages to compensate plaintiff for an increase in the original rate occasioned by the filing of an amended tariff, fraud claim sought to attack the validity of the amended tariff and as such, was completely preempted); Funeral Financial Services, 17 F.Supp.2d at 782-83 (holding that where relief sought is damages for overcharging, claim is preempted by federal law); In Re Comcast Cellular Telecommunications Litigation, 949 F.Supp. 1193, (E.D. Penn. 1996) (holding that "the remedies sought by the Plaintiffs further demonstrate that the true gravamen behind their allegations is a challenge to Comcast's rates and the way in which they are applied").

Claim I alleges that the Defendants' "illegal agreement with and defendants' receipt of kickbacks from telephone service providers constitute unfair and deceptive acts and practices affecting the conduct of trade and commerce," in violation of the Tennessee Consumer Protection Act ("TCPA"). (Compl. at ¶20.) The Complaint alleges that "[a]s a result of those exclusive arrangements and the kickbacks CCA requires to be paid to it, Plaintiff and the other consumers who must accept those collect call charges pay unconscionable connection fees and per-minute charges to speak to their loved ones, family members and friends who are held in [Defendants'] facilities. At the same time, CCA has collected millions of dollars in illegal kickbacks and other payments as a result of its unfair and deceptive acts in violation of the [TCPA] . . . ." (Compl. at ¶15.) The Complaint reveals that Plaintiff's theory as to how Defendants' "unfair or deceptive acts or practices affect[ed] the conduct of any trade or commerce," Tenn. Code Ann. §47-18-104, is that Defendants' engaging in the exclusive service agreements had the effect of raising the rates charged by the phone companies to an unconscionable and excessive amount. Indeed, the Complaint alleges that in order "[t]o comply

12

with that kickback requirement and to maintain their contract, the telephone providers charge

excessive and unconscionable rates for calls made to Plaintiff and the other Class members."

(Compl. at ¶13.)  Thus, a court determining this claim would have to determine whether the rates

were unconscionable or excessive, and if so, whether the phone companies raised the rates as a

result of the kickback requirement.  As such, an essential element of Plaintiff's state-law claim

attacks the reasonableness of the FCC-approved tariff.

Moreover, a review of the damages alleged by Plaintiff and of her requested relief

reveals that Claim I is really challenging the reasonableness of the rates charged by the phone

companies.  Plaintiff alleges that due to the Defendants' violations of the TCPA, she and the class

"have been injured and damaged by paying more for telephone services than they would pay

absent defendants' illegal conduct and agreements . . . ."  (Compl. at ¶21.)  Plaintiff seeks

recovery of "three times the damages sustained by virtue of defendants' violation of the [TCPA] .

. .," the damages being the difference between what Plaintiff paid for collect calls and what she

would have paid absent Defendants' alleged illegal conduct.  (Compl. at ¶¶B, 21.)  Thus, a court

would be required to determine what would constitute a reasonable rate absent the complained of

activity in order to determine the extent of Plaintiff's damages.  Such a determination would

undermine the congressional scheme of uniform rate regulation.  Moreover, the Court would be

essentially reimbursing Plaintiff for a portion of the FCC-approved rate which she paid to the

phone company.  As such, Claim I arises under federal law.

With respect to Claim II, the Complaint alleges that in exchange for the exclusive

right to provide telephone services at the Defendants' facilities, the Defendants have required

phone companies to pay them a substantial portion of the rates collected from consumers such as

13

Plaintiff in the form of a kickback, resulting in the phone companies charging excessive and unconscionable rates for calls made by inmates to Plaintiff and other class members. (Compl. at ¶¶12, 13-15.) Thus, Claim II alleges that Defendants were unjustly enriched "via the kickbacks received as a portion of the unconscionable charges paid by Plaintiff and the Class for collect services for calls [sic] they received." (Compl. at ¶24.) Plaintiff seeks "restitution [of] the entire amounts [Defendants] collected under the agreements and contracts . . . ." (Compl. at ¶C.)

Because the Complaint alleges that the commissions paid to the Defendants were derived from the allegedly excessive rates which the phone companies charged as a result of the kickback requirement, the restitution which Plaintiff seeks is essentially a reimbursement of a portion of the FCC-approved rate which she paid to the phone company. If a court were to find for Plaintiff on this claim, it would be required to find that the FCC-approved rate was unreasonable insofar as it was inflated by the phone companies in order to pay the Defendants a kickback. Moreover, by reimbursing Plaintiff for a portion of the rate which she paid, the court would effectively be lowering the FCC-approved rate. Given that this claim seeks to invalidate the FCC-approved rate as unreasonable, it arises under federal law and thus, is subject to removal.

Thus, because Plaintiff is essentially challenging the FCC-approved rates charged by the phone companies, the FCA provides her with a parallel federal remedy. By giving Plaintiff a federal action against the phone companies, the FCA enables Plaintiff to challenge the reasonableness of the phone companies' rates, which is the true gravamen behind her Complaint. Plaintiff's argument that the FCA does not provide a remedy for the damages caused by Defendants' actions because Defendants are not common carriers is meritless; the FCA provides the precise remedy for the relief which Plaintiff seeks, namely a reimbursement for being

14

overcharged. The fact that Plaintiff sued the Defendants instead of the common carriers cannot mask the true nature of Plaintiff's claims challenging the validity of the rates contained in the tariffs and seeking to recover money allegedly paid in excess of a reasonable rate. Thus, because Plaintiff is challenging the reasonableness of the rates, her claims arise under federal law. The Court finds that Plaintiff's claims were properly removed under the complete preemption doctrine, and that it has original jurisdiction over this action.

## CONCLUSION

Based upon the foregoing discussion, the Court finds that Plaintiff's claims against Defendants are subject to removal under the complete preemption doctrine. Thus, Plaintiff's Motion to Remand, (Doc. No. 12), is hereby DENIED. Accordingly, Plaintiff's Motion for an award of fees and expenses, (Doc. No. 12), is also DENIED.

An Order consistent with this Memorandum shall be entered contemporaneously.

Entered this the ____ day of _____, 2000.

JOHN T. NIXON
UNITED STATES DISTRICT COURT

15